Filed 4/28/21

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C079181 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F00224) |
| v. | |
| JEFFREY DOUGLAS POWELL et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Michael W. Sweet, Judge.  Affirmed.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant, Jeffrey Douglas Powell.

Kyle Gee, under appointment by the Court of Appeal, for Defendant and Appellant, Christopher Lawrence Langlois.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I-IV, VI-IX.

1

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

Defendants Jeffery Powell and Christopher Langlois were convicted of murder committed during their retaliation for the beating of their friend, J.D.,[1] by the victim's son. In the early morning hours of January 5, 2013, J.D., defendants, and a fourth person, J.P., forcibly entered the victim's home and found him sleeping on a couch. Powell and Langlois and possibly J.D. beat the victim and the group then fled within 15 to 90 seconds after their entry. The victim died soon after the attack from a stab wound to the heart. The prosecution contended that Powell inflicted that wound.

A jury found Powell and Langlois guilty of second degree murder (Pen. Code, §§ 187, subd. (a), 189),[2] and first degree residential burglary (§§ 459, 460). Additionally, the jury found true the allegation that, during the commission of the crimes, Powell personally used a deadly weapon. (§ 12022, subd. (b)(1).) The trial court sentenced Powell to 16 years to life and Langlois to 15 years to life.

Defendants raise a number of contentions alleging instructional and evidentiary error, and also assert that the trial court abused its discretion in denying a request to discharge a juror.

We affirm.

---

[1] Because this person was a prosecution witness, provided testimony pursuant to a plea agreement, and is now incarcerated, we have elected to use the initials J.D. (John Doe) to provide him additional anonymity. (See Cal. Rules of Court, rule 8.90(b)(10).)

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### The Charges and the Disposition of J.D.'s Case

Defendants and J.D. were charged with murder (§ 187, subd. (a); count one), and first degree residential burglary (§§ 459, 460; count two). It was also alleged that Powell personally used a deadly and dangerous weapon, a knife, within the meaning of section 12022, subdivision (b)(1).

Prior to the commencement of the jury trial, J.D. withdrew his not guilty plea and entered a plea of no contest to voluntary manslaughter (§ 192, subd. (a)) and admitted a strike prior, agreeing to an aggregate sentence of 27 years in state prison and to testify against defendants.

### The Prosecution's Case-in-chief

On the night of January 4, 2013, J.D., Powell, and a third person, William Beamon, went to a bar in Citrus Heights. J.D. testified they were drinking heavily, drinking beers and taking shots. At approximately 1:30 a.m., they left with two women. One of the women was with Beaman, the other was with Powell, and, because J.D. was a "fifth wheel," they dropped him off at a 7-Eleven. Powell and Beamon then proceeded to a hotel with the women.

At the 7-Eleven, the store clerk allowed J.D. to leave his phone to charge, and J.D. walked around the corner to his cousin's house. After determining that nobody was awake there, J.D. walked back toward the 7-Eleven.

J.S., the victim's son, lived nearby. At approximately 3:00 a.m., J.S. was sitting in his garage with his cousin, looking out for people who had been stealing things in the

---

[3]  While we set forth most of the conflicting testimony, we generally set forth the facts in the light most favorable to the judgment consistent with the usual rules on appeal. (See *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206; *In re Daniel G.* (2004) 120 Cal.App.4th 824, 828, fn. 1.)

neighborhood. The victim and his mother (J.S.'s grandmother), were inside the house. J.S. had consumed approximately a pint of vodka, smoked marijuana and was feeling "a little buzzed."

As J.S. and his cousin sat in the garage, they saw J.D. walking in the street. J.S. went to the street, accompanied by his cousin and J.S.'s pit bull. J.S. confronted J.D., asking if he was the person stealing things from the neighborhood or from his truck. J.D. denied the allegation, told J.S. he was crazy and that he had not been anywhere near J.S.'s truck. At some point, in an effort to deescalate the situation, J.D. said something like "what's up on some weed." J.S. and J.D. continued to talk, and, eventually, J.S. offered J.D. some marijuana as an effort to befriend J.D. and make him less inclined to steal from J.S.'s house. J.D. offered J.S. money for the marijuana, and J.S. responded that he did not want any money. J.D. tried to give J.S. money, and J.S. slapped J.D.'s hand away.[4] Before J.D. knew what was happening, punches were thrown, although no punches landed. J.D. began to run away, and, according to J.S., J.D. said, "[Y]ou better not have no kids in the house. You better hope you have no kids in the house. I'll be back." (Italics omitted.) J.D. denied saying anything like that. J.D. ran back to the 7-Eleven. J.S. followed J.D. for a while, stopped, and returned to his house. His cousin then went home.

After getting his phone and calling a taxi, J.D. sat on the curb. T.B., a woman whom J.D. did not previously know, pulled up in a car and they talked for 15 to 20 minutes.

In the meantime, J.S. drove his truck to 7-Eleven looking for J.D. and saw him there talking to a girl. J.S. testified he was feeling angry and afraid based on J.D.'s threat

---

[4] Police subsequently found a crumpled up $20 bill across the street from J.S.'s house.

to return to J.S.'s house. J.S. went home, retrieved brass knuckles, and then walked back to 7-Eleven.

When J.S. returned to 7-Eleven, J.D. was still there talking to the girl. According to J.S., he confronted J.D., asking him if he really intended to come back to the house or if he was going to "let this go." (Italics omitted.) According to J.D., he was talking to T.B., who offered him a ride home in exchange for some gas money, and as he was placing his possessions in her car, he was "blind-sided" by J.S. J.D. did not recall any conversation with J.S. prior to getting hit. The two began to fight, and, according to J.S., he hit J.D. once in the back of his head with the brass knuckles. J.D. testified that J.S. hit him with brass knuckles multiple times. J.S. ran home.

Earlier, before arriving at 7-Eleven, T.B.[5] had been drinking and was intoxicated. She had also been smoking marijuana. As she remembered the events, when she arrived at 7-Eleven, she stepped out of her car, a Volkswagen Beetle convertible, and saw two men fighting in the parking lot.[6] One of the men was punching the other with brass knuckles. T.B. tried to break up the fight, and she pulled out a knife. The guy with the brass knuckles eventually ran off. J.D. asked her for a ride in exchange for gas money.

After arriving at home, J.S. woke up the victim, his father, who was sleeping on the couch, and told him what happened. He told the victim they had to be vigilant because people could be coming to get him. The victim told J.S. not to worry, and that no one would come back to the house.

J.D. testified that he was "knocked out cold" after being hit by J.S. with his brass knuckles. He "came to in a pool of blood." Thereafter, while in T.B.'s car, J.D. called

---

[5] T.B. testified pursuant to a grant of use immunity pursuant to section 1324.1.

[6] T.B. had no recollection of any interaction with J.D. prior to J.S. and J.D. fighting in the 7-Eleven parking lot.

Powell and told him that he "just got beat up." (Italics omitted.) According to J.D., Powell responded: "Don't worry. We'll handle it -- come get me." (Italics omitted.)

When they left 7-Eleven, J.D. showed T.B. a house and told her "that's where that dude lives." (Italics omitted.) J.D. testified he had wanted to make sure where the house was.

J.D. told T.B. he wanted to meet his friends, so she drove to the hotel. When they arrived, J.D. and T.B. both went inside. Powell, Beaman, and the two women were in the hotel room. According to both J.D. and Beaman, Powell left with J.D. and T.B.[7] J.D. testified that, at some point, Powell stated, "We need to stop by my house real quick. Go to my house." (Italics omitted.) Powell said he wanted to change and "grab something." Beamon told a police investigator Powell said he wanted to stop by his house to pick up something.

T.B., J.D., and Powell proceeded to Powell's apartment. Powell went inside and, when he returned, he had changed. He was wearing Converse shoes and he had some latex or surgical gloves. J.D. testified he did not see Powell with a knife at this point, and there was no discussion about weapons. When Powell got back in the car, he said, "[W]e're going to go pick up my buddy." (Italics omitted.) T.B. then proceeded to a house on Papaya Drive.

J.P. was hanging out with Langlois and two other people in S.H.'s garage on Papaya Drive.[8] J.P. considered Langlois a good friend. According to J.P., Langlois received a phone call about J.D. "getting jumped." Langlois told J.P. that his friend had been jumped by some Russians and he was "going to head out there to handle the

---

[7] As T.B. recalled it, both males from the hotel room left with her and J.D. However, at trial, no one disputed that Beaman remained in the hotel room with the two women when Powell left with J.D. and T.B.

[8] J.P. testified pursuant to a grant of use immunity pursuant to section 1324.1.

problem." He asked J.P. to "back him up being that [J.P.] was his home boy."[9] Later, J.D., T.B., and Powell arrived at the Papaya Drive house. J.P. saw that J.D.'s "head was really split open really bad."

Thereafter, Langlois, Powell, J.D., J.P., and T.B. left the Papaya Drive house in T.B.'s Volkswagen bug. T.B. was driving, J.D. was in the front passenger seat, and Powell, J.P., and Langlois were in the back seat. J.D. told T.B. where to go.

J.P. believed that they were "going to Citrus Heights to . . . give [J.D.] some payback for what happened to him." He testified that he did not have any weapons, and he did not see anyone else with any weapons. J.D. testified: "I don't really know exactly what I thought. There was -- I'm sure there was some intention of fighting, beating someone up. Never was murder the intention."

They parked near a corner of the street where J.S. resided. All of the men got out of the car, someone told T.B. to wait there for a few minutes, and someone also told her to keep the car running. The car was running when the men left, walking down the street.

Earlier, at the victim's house, J.S., had stayed up with the victim until the victim encouraged him to go to bed, saying, "They're not coming." (Italics omitted.) J.S. went to sleep in his bedroom, leaving the victim on the couch in the living room.

J.D. testified that he led the group down the street. According to J.P., when they first arrived, while they were on the sidewalk, Langlois said, "[T]his is stupid. This is retarded. Let's just go," or "I got to get these guys out of here. This is retarded. What are we doing here?" (Italics omitted.) J.P. testified he said something similar. J.D. had difficulty remembering exactly which house he was looking for. J.P. testified that Langlois told J.D., "[I]f you can't figure it out, we should leave. Let's get out of here." (Italics omitted.) J.D. testified that, when they got in front of the victim's house, he

---

[9] J.D. denied that he ever stated he was jumped by Russians.

looked at Powell and told him he was not comfortable. According to J.D., Powell shrugged and Langlois told J.D.: "[I]t's too late. Don't act like a bitch. It's time to go." (Italics omitted.)

According to J.P., after Langlois said "if you can't figure it out, we should leave," J.D. saw the house he was looking for and said, "[F]uck it," ran up to the house, and kicked in the front door. (Italics omitted.) J.D. acknowledged that he ran up to the house and kicked the door in.

When J.D. kicked the door in, he fell to his knee. According to J.P., Powell ran in into the house behind J.D., and Langlois and J.P. followed. According to J.D., Powell and Langlois ran by him into the house directly at the victim on the couch. J.D. testified he realized that the victim was not J.S., and that he had never seen the victim before. J.P. testified that he saw a man sleeping on the couch. He then saw the man on all fours getting beaten, primarily by J.D. and Powell. According to J.P., J.D. was punching and kneeing the victim, and Powell was punching him. According to both J.P. and J.D., Langlois picked up a coffee table and hit the victim with it. J.P. testified that the victim was on his hands and knees when Langlois hit him with the table. Seconds after Langlois hit the victim with the coffee table, the guys left. J.P. testified he never touched the victim. He estimated that they were in the house for a total of 60 to 90 seconds. He did not see anyone using a weapon and he never saw Powell with a knife.

J.D. testified that it was Powell and Langlois who beat the victim. Powell was wearing gloves. J.D. testified he did not approach the victim and he did not kick or punch him. He denied stabbing the victim. According to J.D., he did not participate because the person they were beating was not the person who beat him up earlier. He testified he did not see any weapons. Suddenly, everyone fled. The victim then lunged at J.D. J.D. was bloody, the victim was bloody, and J.D. testified that he "just kind of spun off of him, and . . . got out of there." J.D. estimated that the entire incident lasted no more than 15 seconds.

8

J.S. woke up hearing people talking outside. J.S. then heard a loud bang, a succession of banging noises, and he got up. By the time J.S. got into the living room, approximately 10 or 15 seconds after he first heard a banging noise, "everybody was already gone." J.S. found the victim standing there. He uttered his last words, telling J.S., "they got me." (Italics omitted.) The victim's mother came out of her room and she and J.S. performed CPR on the victim. She also called the police. The victim was dead before medical assistance arrived.

J.D., Powell, Langlois, and J.P. ran back to T.B.'s car. According to T.B., they had been gone "a few minutes." When they returned, they appeared "erratic" and shaken, and it looked to T.B. "like something happened." Powell, J.P., and Langlois sat in the back seat. After J.D. got in the front passenger seat, he looked back, asked what happened, and at that point he saw Powell hand Langlois a knife with a black handle. J.D. did not know what Langlois did with the knife. J.D. had blood all over him. T.B. testified she asked what happened, and one of the guys responded: "shut up. Start driving. Get out of here." (Italics omitted.) She complied. Someone told her to drive back to the Papaya Drive house.

According to J.P., Powell called someone and told them that he "screwed up really bad." Powell then told J.P. that he "threw the knife . . . [into] a bush by the car." J.P. saw that Powell was cut on his right hand and right leg. The wound on Powell's hand led J.P. to believe that Powell had stabbed someone and the knife slipped in his hand. Also, according to J.P., Powell told him the knife slipped out of his hand.

Once back at Papaya Drive house, everyone got out of the car, and, according to T.B., J.D. told her that she should come inside or that someone wanted to speak with her. T.B. went with the men into the garage. J.D. testified that, once inside, they used methamphetamine and talked. According to J.D., at one point, Langlois told the group, "I just had to hit him."

The garage at the Papaya Drive house was set up like a room with a television, chairs, couch, and a table. Earlier, S.H., the resident there, had passed out on the couch in the garage from taking GHB. She estimated she passed out around 2:00 or 3:00 a.m. and J.P. and Langlois were there at the time. She woke up at 6:30 or 7:00 a.m. to the sound of the gate opening outside, and she remembered telling police that, as she awoke, she heard Langlois say something like, "[S]he's passed out. Perfect." (Italics omitted.) S.H. then saw J.P., Langlois, two other males she did not know, and a female in the garage. On her home surveillance camera, she saw a Volkswagen bug convertible parked outside. One of the males she did not know was "hyper" and had a cut on his forehead, and S.H. helped him dress his cut. At some point, S.H. looked over at the other male she did not know, who was very quiet, and saw him washing his hands in the sink. S.H. testified, "there was like blood everywhere." Based on the volume of blood, she believed the person washing his hands was injured. In a photo lineup presented to her later, S.H. selected Powell's photograph as one of two individuals in the lineup who could have been the guy washing his hands in the sink. Langlois was trying to help him clean his hand. She said to Langlois, "Chris what the heck," and he told her to "shut up."

J.D. testified that someone brought up the issue of the knife, and someone, told him he needed to go back and look for it. J.D. testified he was not sure who asked him to do that, but said he was pretty sure it was Langlois. T.B. drove J.D. back to the area near the victim's house. However, when they arrived in the area, the police were present, and J.D. told T.B. to turn around and get out of there.

J.P. told somebody they needed to take T.B.'s identification to find out where she lived because nobody knew her. According to J.D., Langlois was being very threatening towards both him and T.B., telling them that they "better not snitch." T.B. testified she gave her driver's license to a guy with sleeve tattoos who "didn't have a good look on his face." She remembered telling the police that the guy with the sleeve tattoos said, "[W]e don't trust her. She's a snitch." (Italics omitted.) At trial, T.B. identified Langlois as

10

possibly being that person. J.P. testified that he took T.B.'s license and gave it to J.D. so that he could get the information from it. J.D. testified that J.P. took T.B.'s license and wrote down her information. Langlois photographed it.

J.P. saw the victim's blood on Powell's and J.D.'s clothing. J.P. advised the men to change clothes and use ammonia to get rid of DNA evidence in the house. J.D., Powell, and Langlois changed into clothes from S.H.'s house. J.P. collected and bagged their bloody clothes, put them in a container, and put the container in the side yard. J.P. testified he also attempted to clean up T.B.'s vehicle. He was only able to get a little of the blood off of the seats before T.B. said she had to leave. Eventually, T.B. left the house, but J.D. and someone else followed her out. J.D. and the other guy tried to convince her not to leave, but she drove away. T.B. testified that, after she left, J.D. called her and told her to lie to police if she was ever questioned. Later in the day, T.B. attempted to clean her car, cleaning blood from the doors and discarding tissues, trash, and bandaging.

T.G., who was friends with Powell and knew Langlois, received a call from Powell asking T.G. to pick him up from the Papaya Drive house. T.G. told investigators that when Powell called, he said, "I don't want to talk about it over-the-phone. It's all bad." T.G. picked up Powell and J.D. at or near the house a little while after T.B. left. Thereafter, Langlois and J.P. remained at the Papaya Drive house for some time.

T.G., J.D., and Powell all went to T.G.'s house. Powell had a cut on his hand and a more severe cut on his leg. J.D. saw that Powell was bleeding from a wound on his leg, and, according to J.D., Powell and T.G. attempted to stitch the wound closed.

Hours into the investigation, police identified J.D. as a suspect. He had left his bus pass at the 7-Eleven. There was also surveillance footage from the 7-Eleven and from the gas station across the street linking J.D. to T.B.'s convertible Volkswagen bug. Later that day, after J.D. learned that the victim had died and that police had raided his house, he fled to Los Angeles and later to San Diego.

11

Dr. Gregory Reiber, the forensic pathologist who performed the autopsy, testified that the victim sustained three stab wounds: on the outside of his left arm, a small puncture wound on the right side of his chest and a large stab wound on the left side of his chest. The large stab wound penetrated between the victim's ribs, into the left ventricle of his heart and was the fatal wound. The victim also sustained a number of blunt injuries to his face, arms, wrists, hand, leg, feet, and back. The facial injuries were consistent with being punched.

Trevor Wilson, a criminalist at the Sacramento County District Attorney's Crime Lab, testified as an expert in forensic processing of crime scenes and trace evidence. He testified there were " bloody footprints in the house." They included shoe prints made from Converse shoes, Vans shoes, and And1 basketball shoes. A shoe print on the exterior of the front door of the house matched the Vans shoe print. Additionally, a shoe print matching Vans was found on the underside of a coffee table.[10] Wilson testified that he located at least six footprints within the house that were consistent with Converse shoes. There were also several of the Vans shoe prints inside, and those were the footprints found furthest inside the house.

Later, executing a search warrant at Powell's apartment, police discovered a Converse shoe box, but no Converse shoes. At J.D.'s house, police found a Vans shoe box, but no Vans shoes.[11]

Despite a search of the block, police did not locate the knife used in the attack. At some point, police went back to the victim's house and asked if any knives were missing. J.S. said "something about [the victim's] favorite knife was missing." J.S. gave police a

---

[10] The victim's family found the coffee table turned up-side-down with the bloody shoeprint on its underside. They turned it right-side-up before the police arrived.

[11] J.D., who admitted kicking in the front door, testified that he wore Vans shoes and the shoe print on the door was his.

knife from the house that was one of a set of 12 or 13 steak knives or similar knives. J.S. did not know when the missing knife went missing. He testified that the night before the victim was killed, the victim ate lasagna, and he did not use those knives. J.S. also testified that, after the incident, there were no dishes or utensils in the living room.

Dr. Reiber opined that the steak knife was consistent with the type of weapon that caused the victim's stab wounds. However, he could not say whether that knife or one like it was, in fact, the weapon used in the attack.

Ryan Nickel, a criminalist in the forensic biology section of the Sacramento County Crime Lab, testified as an expert in DNA testing and analysis. He testified that no DNA matching that of J.D., Powell, Langlois, or J.P. was discovered in the victim's house. Blood matching Powell's DNA profile was found on the sidewalk near the gate at the Papaya Drive house. J.P.'s DNA profile was found on a sample of possible blood found on a carpet mat located outside of the garage area of the Papaya Drive house. This sample contained a mixture, with the major contributor matching J.P.'s DNA profile and the minor contributor being consistent with the victim's DNA profile. Nickel explained the victim's profile was very weak, he could not get all 15 locations and the statistical results as to this sample really had no relevance for determining the actual contributor. Another swab of blood sample found on the carpet mat also matched J.P.'s DNA profile.

Blood found in T.B.'s car was analyzed. One blood sample from the passenger side door liner was a mixture, with the major contributor matching J.D.'s DNA profile. The major contributor to a blood sample found on the glove compartment matched the victim's DNA profile. Samples from the glove box matched the victim's DNA profile and J.D.'s profile. A blood sample from the front passenger seat also matched the victim's profile. A possible blood sample from the passenger-side back seat matched Powell's DNA profile. And a blood sample from the back of the vehicle's center console matched the victim's DNA profile.

Powell's cell phone was examined after his arrest. There were repeated communications between Powell's phone and J.D.'s phone, Langlois's phone, and J.P.s' phone the night and morning of the murder. A photograph showing T.B.'s address and her father's name was found on J.P.'s phone in a message sent from Langlois's phone.

Christina Langlois (Christina), formerly Christina Brown, testified that she was Langlois girlfriend and the two had been married prior to the trial. During her testimony, Christina denied having any conversation with Langlois about the murder. She denied having made a number of statements to Detective Shaun Gualco about what Langlois told her, including that Langlois told her he had been helping a friend, he was helping J.D. get back at somebody, and that he had her check the computer to see if J.D. had been arrested. She testified, "Those words never came out of my mouth." She did admit that, at some point, Langlois told her that "he fucked up" and that he was sorry because he was on the run from parole.

Detective Gualco testified that he surreptitiously recorded a conversation with Christina. The recording was played for the jury. Early in the conversation, in response to Gualco's questions, Christina said she did not know what happened, but then said, "All I know is what he told me." Gualco asked what Langlois had told her and Christina responded, "that he was helping a friend and so it was a friend and – and he fucked up because he was the last person that touched whatever and . . . he told me he was lied to by his friend because he wasn't knowing that, uh, night was gonna come out to that." She went on to explain, "He doesn't know that that's what they were going for . . . so basically he was just lied to." When asked to guess who it was who lied to him, she said J.D. Gualco asked if Langlois mentioned anyone else, and she responded, "All I know is that there was a girl driver and he never met her before." Christina said she thought Langlois told her these things about "three weeks ago" (the interview took place on January 25, 2013), but she was not positive of the timing.

14

Gualco asked about Christina previously telling another law enforcement officer about a knife with Langlois's fingerprints. Christina responded, "Well, he thinks it is." In response to Gualco's question concerning what Langlois mentioned about that, Christina stated, "Because he said . . . when the other person kept grabbing him or whatever and, um, before he could . . . get him off of him like he tried to see if the guy was okay and he pulled the knife out and he said that by then it was too late." She said Langlois did not say what he did with the knife or who had stabbed the victim.

When Gualco asked, "So he said he pulled it out?" Christina responded, "Yeah, Well, he never said he pulled it out. He said he took it off of him. I don't know if that was because he was trying to not beef with the (unintelligible) about it or. . . ." Christina then said she was under the impression that a stabbing had occurred because of what the other law enforcement officer had said to her. Gualco explained he only wanted her to tell him what Langlois had said to her. She told Gualco that Langlois did not say it was a knife and never told her "what the weapon was." She then said Langlois never said "it was a weapon."

Christina said that Langlois did not tell her all of this on one occasion, but rather in "bits and pieces." She explained, "the first time I had heard about it, he came into my house crying. Just crying," "[b]ecause he's like 'I fucked up. I don't know what's going on.' " He told her "he went with a friend and he just thinks he fucked up cause his fingerprints were on something. That's all he said." She estimated that the next time she talked to Langlois was about a week later. It was at that time he told her there was a girl driving whom he had never met before "and his friend [J.D.] or whatever that he was supposedly going to help out . . . it was him getting back at somebody. Like, he was supposed to get back at somebody or something but that's – that's all he went into." She said Langlois did not say what they were getting back for "but he was supposed to help him out like I guess . . . like he got punked, lost or something and he wanted to get back at the guy."

15

Christina told Gualco that Langlois "kept having me look up [J.D.] on the computer to see if he was arrested." She explained, "[t]hat's I guess why I'm assuming it was [J.D.] but he never said it was."

Gualco told Christina that Langlois was a fugitive, marshals and parole were looking for him, and that Langlois was "wrapped up in this." Christina indicated she wanted Langlois to come forward, and then said, "And honestly I wanted him to call me, but for some reason ever since you guys showed up to my house he has not called me. He was supposed to come that day and he never came so I don't know where . . . he is." She told Gualco that she asked Langlois, "Why are you hiding? It makes you look bad." She then told Gualco she thought Langlois was just scared to go to jail.

J.P. testified he saw Powell in a pool hall a week or so after the killing. J.P. told Powell he needed to get a new identity and get a new life. J.P. believed law enforcement would catch up with Powell because J.P. believed Powell left DNA at the scene. Powell responded that he was not going to run.

Arrested in Citrus Heights on January 12, 2013, Powell was the first person arrested in connection with this case. According to a nurse practitioner at the Sacramento County main jail, when Powell was admitted, he had a laceration on his thigh that had been stitched together non-professionally with fishing line. Powell told her that he had sutured himself.

Gualco testified that after he identified Langlois as a person of interest, he spent "some time" looking for him. Langlois was arrested in the Carmichael area approximately one month after the killing.

The parties stipulated that, if Dr. John O'teri were called to testify, he would testify he examined Langlois on February 2, 2013, and diagnosed him with a fracture on his right hand commonly known as a boxer's fracture which was consistent with an injury sustained as a result of punching an object. Further, O'teri would have testified that, based on the healing of the fracture, the injury was between one week and one month old.

16

Langlois told O'teri that he had punched a wall, and that he had begun to feel the pain in his hand one week prior to the examination.

As noted, J.D. fled to San Diego. He was arrested there four months after the murder.

## Evidence Presented by Langlois

Nicolas Burgos, Christina's former boyfriend, testified that on or about January 15, 2013, he and Christina were having an argument when Langlois came over. Langlois went into another room and spoke with Christina. Langlois then came to where Burgos was, and the two got into a fight. Langlois hit Burgos on the left cheek "pretty hard" with his right hand, and the two "just kind of box[ed] it out."

## Evidence Presented by Powell

Powell testified that he had prior felony convictions for residential burglary in 2003 and for conspiracy and evading a police officer in 2007.

Consistent with J.D., Powell testified that, on January 4, 2013, he, Beaman and J.D. left a bar and went to a hotel with two women, dropping J.D. off at the 7-Eleven on the way. Later, J.D. called Powell, saying he "just got jumped." Powell asked him if he was okay, and J.D. responded that he was not, that his "face was split open" and he was bleeding. (Italics omitted.) Powell encouraged J.D. to come to the hotel and told him, "[W]e'll figure it out." (Italics omitted.) Powell denied saying he would "take care of" or "handle" anything. Powell testified he was intoxicated, unable to perform sexually, and embarrassed. He said J.D.'s interruption was "perfect" and gave him an opportunity to "get away."

J.D. arrived at the hotel and told Powell "[t]hey just came out of nowhere, and they jumped me." (Italics omitted.) J.D. refused to go to the hospital, so, according to Powell, they decided to go to his apartment to get some medical supplies to clean J.D.'s injuries.

17

T.B. drove Powell and J.D. to Powell's apartment. Powell went inside and grabbed some methamphetamine and some medical supplies. He denied getting gloves or a knife. He testified that his father was at his apartment, so they could not hang out there, and he looked for another place to go. He called Langlois. Powell, J.D., and T.B. then went to the Papaya Drive house and, upon their arrival, went inside the garage. J.D. began "patching his face up" and Powell sat down.

At some point, J.D. indicated that he wanted to go back to 7-Eleven to "get [his] shit." Powell testified that he assumed J.D. also wanted "to see if those guys were still there." He thought J.D. wanted to get back at the guys who beat him up. Powell denied it was his idea to go back to that area. J.D. asked Powell to go with him. According to Powell, J.D. never said anything about going to a house. Powell then asked Langlois to come along. Powell testified he had no idea why J.P. ended up joining them.

They all piled into T.B.'s car, and J.D. told her to drive to the 7-Eleven. At some point, J.D. told T.B. to pull over, and she did. J.D. said, "this is it," exited the car and started walking up the street. (Italics omitted.) Powell got out of the car and followed J.D., and Langlois and J.P. followed behind. According to Powell, everyone was asking J.D., "[W]hat are we doing here? What is this?" None of this was making sense to Powell because they were supposed to be going to 7-Eleven, and J.D. had not told him he got into an altercation in front of a house. Powell, Langlois, and J.P. were all looking around. They were in the middle of a residential neighborhood in the middle of the night. They thought they had no business being there, and that someone might call the police. According to Powell, they wanted to leave, but J.D. said, "no. This is the house. This is the house." (Italics omitted.) Powell testified that he told J.D.: "[You] [n]eed to quit acting like a bitch. You got your ass whooped. It's not that big of a deal. I mean, what are we doing here? Take your ass-whooping like a man. We need to leave." (Italics omitted.) J.D. said, "[F]uck it," turned around, and "bolted towards the door" of the

18

house and kicked the door in.  (Italics omitted.)  Powell testified he "ran straight after" J.D. "to drag his ass out of there."

As Powell entered the house, he saw J.D. fighting with someone in the middle of the living room.  Powell tried to grab J.D., but was somehow thrown between them and "got whacked."  He testified he got stabbed in the leg and cut on the hand, although he did not immediately realize it.  Powell then turned around and ran out of the house.  Powell told the jury he never touched the victim and did not assault him, stab him, or kill him.  He also testified that he never had a knife when he was in the house.  He said he did not see J.D. with a knife, and did not see a knife at all that night.  He claimed to have had no idea at the time that the victim had been stabbed.

T.B. drove everyone back to the house on Papaya Drive.  According to Powell, T.B. and J.D. then went somewhere while everyone else went into the garage.  Powell washed the wound on his hand, wrapped it up, and then tended to the wound on his leg.  He also changed pants because his pants were bloody and cut.  After 45 to 60 minutes, J.D. and T.B. returned, and everyone smoked methamphetamine.

At some point, T.B. left.  Powell called T.G. for a ride.  T.G. came to the house on Papaya Drive and picked up Powell and J.D.  They went to T.G.'s home.  There, Powell showered and then attempted to suture his leg with T.G.'s assistance.  Later, T.G. dropped Powell off at home while J.D. stayed with T.G.

On a subsequent day, Powell saw J.P. at a pool hall.  J.P. told Powell he should get a new identification card and that he should run away.  Powell testified he did not run away because he did not do anything wrong.  Powell told J.P.:  "you['re] trippin'.  What do I need to run from?  I mean, I'm the [one] that got stabbed."  (Italics omitted.)

Powell testified that he had nothing to do with the victim's death.  He stated: "I wish this didn't happen.  I wish that I could take back some of the things that happened that night, but I can't.  Only thing I can tell you guys is I went in there to drag my dumb ass friend out of there.  That's what I did.  That's all I did."

19

On cross-examination, Powell testified that J.D.'s testimony was largely untrue. Powell testified that he did not recall seeing Langlois punching or striking the victim, and he did not see anyone throw a table at him. He acknowledged that he was wearing Converse shoes on the night of the incident. Powell also acknowledged that he deleted calls and text messages to and from anyone associated with this case, and he got rid of his bloody pants and the shoes he had worn at the time of the attack. He acknowledged that he "tried [to] cover [his] tracks a little bit . . . ." However, he denied getting rid of a knife.

### The Verdicts and Sentencing

The jury found Powell guilty of murder in the second degree (§§ 187, subd. (a), 189) and found true the enhancement that, in the commission of the crime, he personally used a deadly weapon within the meaning of section 12022, subdivision (b)(1). The jury also found Powell guilty of first degree residential burglary. (§§ 459, 460.) The trial court sentenced Powell to an aggregate term of 16 years to life, calculated as follows: 15 years to life on count one, murder in the second degree, and a consecutive one-year term on the personal use of a deadly weapon enhancement. The trial court imposed the upper term of six years on count two, first degree residential burglary (§ 459), but stayed execution of that sentence pursuant to section 654.

The jury also found Langlois guilty of murder in the second degree (§§ 187, subd. (a), 189) and first degree residential burglary (§§ 459, 460). The trial court imposed a sentence of 15 years to life on count one. The trial court imposed the upper term of six years on count two, but stayed execution of that sentence pursuant to section 654.

# DISCUSSION

## I.  Admission of the "Beastly Services" and Stealing Credit Text Messages

### A.  Additional Background

#### 1.  Pre-trial Proceedings

In the prosecutor's in limine motions, he moved for the admission of text messages recovered from Powell's mobile phone as demonstrating consciousness of guilt and admissions.  At issue are text messages sent to Powell from an unknown person after the time of the killing stating:  "Either way my boy I love you homie i'm not gonna preach to you cuz knowats up bro, *the beast is in you* so I respect it but wat I dnt like is doin itfor sumone whos not worthy of *ur beastly services*..  I love you bruh nowI gotta do damage control shake the bums remember my boy noteveryone is worth ur freedom but either way any way I can help let mekno.."[12]  (Italics added, other italics omitted.)  One minute later, Powell responded with a text stating:  "Thanks bro appreciate it."  (Italics omitted.)  Approximately one hour later, Powell received another text from the same phone stating:  "For sure bruh I already kno you got me but im worried bout u."  Powell responded, "I got at least a few days . . . ."  (Italics omitted.)  One minute later, Powell received another text, stating:  "Yea youll b good for a few days for sure.."  (Italics omitted.)  Powell received another message from the same phone stating:  "Cum monday u better take out loans n shit get ready for da worse myboy."  (Italics omitted.)  Powell responded:  "Haha no shit."  (Italics omitted.)  He then received a message stating:  "Na cuz u can bail out u kno or ur boy can 'steal' ur credit n split I'm jussain . . . ."  (Italics omitted.)  Powell responded:  "We will c how things go.  I'm tryn to get that thang n wrap things up ufeel..  We will c."  (Italics omitted.)

---

[12]  We quote the text messages as they are set forth in the record, making no changes to spelling or punctuation.

The prosecutor asserted that this text message exchange was relevant in that it appeared to reference criminal activity "and the potential for law enforcement interests and going on the run." Langlois's attorney argued that there was not sufficient foundation for the evidence to be admitted because the sender of the messages to Powell's phone was not known, nor was it known "what interests they have or what they know." Langlois's attorney asserted that the messages constituted hearsay. Powell's attorney asserted that the text messages were irrelevant, hearsay, they called for speculation, and they should be precluded on Evidence Code section 352 grounds. Powell's attorney emphasized that it was not clear from the messages what they were discussing. He further asserted that Powell had not been on the run, and the text messages therefore should not come in to show that he was on the run or about to run.

The trial court stated: "I think what I should do is obtain a copy of the texts and then review them, and then we may have to go text-to-text regarding objections if any. [¶] Some of it certainly sounds like it should be admissible. Some of it I'm not quite sure."

2. **Hearing During Trial**

The court held a hearing during the trial to consider the text messages. The prosecutor argued that there was testimony that Powell made a phone call in the minutes after the attack in which he stated that he had screwed up. Within two hours of the attack, he received the text stating: "Doing it for sumone whos not worthy and not worthy of ur beastly services" and "it's not worth ur freedom either." (Italics omitted.) The prosecutor asserted that Powell's text in response -- "Thanks bro appreciate it" (italics omitted) -- constituted an adoptive admission.

Powell's attorney disagreed, asserting that there was "a problem with foundation of knowing who it is and why they would be saying such a thing. Hearsay. As well as 352." He further asserted that Powell's text stating only "[t]hanks bro appreciate it" did not rise to the level of an adoptive admission "because there are several things said in the

22

message, and we don't know what he's saying [t]hanks bro to." (Italics omitted.) According to Powell's attorney, by sending his text message, Powell was not adopting anything said in the incoming text message. Powell's attorney continued: "It's just the guy saying I love you, and basically even to the I love you, [t]hanks bro appreciate it, could -- is the logical reasonable response, but it is this person who we do not know and we cannot call who talks about some beast in him. It's improper character analysis of this individual who clearly is not involved in anything but is just giving their opinion . . . ."

In reply, the prosecutor analogized the text message exchange to a jailhouse call: "[i]f you don't know who is on the other end of the line, that is not a foundational issue for admission."

The trial court agreed it did not matter who sent the message, but concluded that Powell's response did not constitute an adoptive admission. The court stated: "I can't tell whether he's thankful for the last statement, or he's adopting it, but I don't find this to be an adoptive admission." The trial court ruled that the text message would not be admissible in the prosecution's case-in-chief. The court agreed that they could revisit the issue in the event that Powell chose to testify.

The prosecutor then argued that the series of text messages between Powell and the unknown person discussing the fact that Powell had "a few days" and Powell stating that he "better take out loans, get ready for the worst" constituted evidence of consciousness of guilt. Powell's attorney responded: "The exact same objection of foundation, hearsay, and 352." He further asserted that there was no question that Powell had been at the scene of something occurring, that law enforcement would be looking for him, and that it would be wise to obtain money for bail. He asserted that this did not amount to consciousness of guilt, particularly in light of the presumption of innocence.

The court ruled that this exchange could be admitted relevant to consciousness of guilt.

23

After Powell's direct examination, the parties revisited the subject of the text messages. The court essentially decided that the "beastly services" text message could be admitted in Powell's cross-examination.

### 3. Powell's Cross-examination

On cross-examination, after eliciting testimony from Powell that he never intended to run, the prosecutor asked Powell about the incoming text message stating that Powell could steal some credit and split, and Powell responded that it referred to an ongoing joke that his friend would "steal" his good credit and obtain money and then split the money with Powell. He denied that the suggestion that he could "split" was a reference to going on the run. Asked about the text stating "the beast is in you," Powell responded that he had "no idea what he's talking about or what he's trying to say or get at." (Italics omitted.) Asked about the text stating "[s]o I respect it but wat I dnt like is doin itfor sumone whos not worthy of ur beastly services," Powell responded, "I don't know what he's insinuating or talking about really," and "[i]t's not clear." As for the incoming text stating, "I love you bruh nowI gotta do damage control," Powell testified: "I really don't understand what he's trying to say. That's why when I responded, Thanks bro appreciate it, all's I'm referring [t]o is that he loves me and that he's here for me. I don't know what the hell he's talking about or what he's insinuating." About the incoming text message stating, "Gotta do damage control shake the bums remember my boy noteveryone is worth ur freedom," the prosecutor asked: "Do you agree that sounds like he thinks, at least, that you've done something who is not worthy of your assistance; that this person believes that they're going to have to do damage control, and that this may cost you your freedom?" (Italics omitted.) Powell responded: "[F]rom what I told him is that . . . [J.D.] roped us into this -- going back to this place, and it was bullshit, and then he lied to us, and that I had to go in there and drag him out, and now I was worried about being tied into a home invasion." Asked if he said anything in his conversations with the person who sent the text messages which could constitute "beastly services," Powell responded:

24

"All's I told him is what I told everybody else. I ran in there and tried to drag him out of there. So that's what I told him." Powell testified that he did not think he said anything to that person which could be considered or mistaken for "beastly services." He also did not think that he said anything which would lead someone to believe that they had to do damage control for him.

### 4. Closing Arguments and Jury Instruction

In closing argument, the only use the prosecutor made of the text messages was to argue that they served as accomplice testimony corroboration, to attack Powell's credibility on his claim of consciousness of innocence and demonstrate consciousness of guilt. He did not argue that the text messages showed Powell was a beast, was disposed to performing beastly services or any similar propensity argument.

Regarding accomplice corroboration, the prosecutor asserted that the text messages tended to connect Powell to the crime. As part of a list of evidence tending to connect Powell to the crime, the prosecutor noted: "And then [] Powell's text that he can't explain how the guy he told he was innocent, he was just helping a buddy and didn't do anything, is talking about the beast is in you. Not everybody's worthy of your beastly services, or your freedom. Tends to connect him to the crime. [¶] How about the texts about you've got a few days. You can bail out. You can go on the run."

Regarding Powell's credibility and consciousness of guilt, the prosecutor argued: "Well, he told [the text message sender] he was innocent … [¶] I told him I was innocent. I told him the same story I've told you, ladies and gentlemen. …. [¶] His response is, beastly services not worth your freedom. Those statements make sense if he told [the text message sender] as [J.P.] testified, that Powell made a call and said; Man, I just fucked up." The prosecutor continued: "What makes sense about the other texts? [¶] Powell never thought of running, and [the text message sender] was just joking, this long-standing joke, about stealing your credit and splitting the proceeds, or that the conversation explains itself, that's talking about, I got at least a few days. [The text

25

message sender] says, you can bail out. Yeah. I can bail out. Says, you can steal your credit and split. [¶] Why would Powell . . . give half his credit to some other guy? . . . Why would he give half his money away to [the text message sender]? Why wouldn't he just do it himself?"

The trial court instructed on credibility of witnesses and on flight/conscious of guilt. It did not instruct the jury with CALCRIM No. 357 on adoptive admissions.

## B. Powell's Contentions[13]

Powell asserts that the trial court abused its discretion in permitting testimony that he received text messages suggesting he had offered "beastly services" and that he might consider absconding. According to Powell, the "beastly services" text message, which the trial court ruled inadmissible on the prosecution's case-in-chief, was not rendered admissible as a result of his testimony. Powell asserts that the sender of the text messages was unavailable, and consequently he lacked the opportunity to confront and cross-examine the sender. Powell asserts that, assuming the sender knew something had happened, he did not know any details, emphasizing that J.P. did not testify that Powell said anything on the phone other than that he had "screwed up." According to Powell, the "beastly services" text message was highly prejudicial and uniquely damaging to Powell's character. Further, Powell asserts that the text message describing running up Powell's credit in order to take the money and "split" was hearsay inadmissible for any legitimate purpose.

## C. Hearsay, Party Admissions, Adoptive Admissions and Standard of Review

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Hearsay is not admissible unless it qualifies

---

**13** On appeal, Langlois has joined in Powell's text message argument.

26

under some exception to the hearsay rule." (*People v. Davis* (2005) 36 Cal.4th 510, 535 (*Davis*).)

The adoptive admissions exception applies here. Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." "In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*Davis*, *supra*, 36 Cal.4th at p. 535.) For statements to be admitted as adoptive admissions, the statements need not be accusations as such; it may be sufficient that the defendant heard and understood statements, had the opportunity to deny them, and remained silent or offered an evasive or equivocal statement. (*People v. Fauber* (1992) 2 Cal.4th 792, 852-853 (*Fauber*); see also *People v. Combs* (2004) 34 Cal.4th 821, 843 (*Combs*).) Section 1221 contemplates "either explicit acceptance of another's statement or *acquiescence in its truth by silence or equivocal or evasive conduct*." (*Combs*, at p. 843, italics added.)

We review the trial court's determination as to the admissibility of evidence, including the application of exceptions to the hearsay exclusionary rule, for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Rowland* (1992) 4 Cal.4th 238, 264; *People v. Mayo* (2006) 140 Cal.App.4th 535, 553.)

### D. Analysis

The trial court did not abuse its discretion in admitting testimony concerning the "beast" and "beastly services" text messages or the text messages concerning capitalizing on Powell's credit to obtain funds.

**1. The Text Message Referencing "the Beast" and "Beastly Services"**

The sender texted: "Either way my boy I love you homie i'm not gonna preach to you cuz knowats up bro, *the beast is in you* so I respect it but wat I dnt like is doin itfor sumone whos not worthy of ur *beastly services*..  I love you bruh nowI gotta do damage control shake the bums remember my boy noteveryone is worth ur freedom but either way any way I can help let mekno.." (Italics added.)

With regard to the knowledge and understanding requirement for adoptive admissions, it is clear Powell had knowledge of the content of the sender's statement on his own phone. He received the text message and he responded to it. And the evidence suggested Powell understood what the sender meant since Powell did not express any confusion in his response to the text message. That Powell claimed during his testimony that he had no idea what the sender meant does not affect the admissibility of the text message. Defendant's purported confusion over what the sender meant was a matter that would have gone to the weight, not the admissibility, of the text messages.**14**

As for the second requirement, that by words or conduct, Powell adopted the statement as true (see *Davis*, *supra*, 36 Cal.4th at p. 535), one minute after receiving the sender's message, Powell responded: "Thanks bro appreciate it." (Italics omitted.) Powell had the opportunity to deny the statements or challenge the sender on what he meant by "the beast" in him or Powell's "beastly services," and instead he thanked the sender. This conduct in responding to the text and the words defendant used amounted to an adoption. (See *Combs, supra,* 34 Cal.4th at p. 843 [statement can be adopted by "acquiescence in its truth by silence or equivocal or evasive conduct"]; *Fauber, supra*, 2 Cal.4th at p. 852 [when in the face of an accusatory statement, a defendant gives an evasive or equivocal reply, the reply may be offered as an adoptive admission].)

---

**14** As to the weight of Powell's claim, it seems incredible that he did not know what the sender meant by doing "damage control" and did not ask what was meant by that.

28

Accordingly, we conclude, the trial court did not abuse its discretion in admitting testimony concerning these statements.

## 2. Text Message Referencing Stealing Powell's Credit

As for the sender's text message stating, "[U] can bail out u kno or ur boy can 'steal' ur credit n split I'm jussain . . . ," (italics omitted) again, Powell had knowledge of the content of the sender's statement. He received this text message and responded to it. And the evidence suggested Powell understood what the sender meant. To this text message, Powell responded: "We will c how things go. I'm tryn to get that thang n wrap things up ufeel.. We will c." (Italics omitted.) Again, Powell's response indicated no confusion about the sender's text. As with the "beast" messages, Powell had the opportunity to deny the credit statement, and instead responded that he would see how things went and wrap things up, clearly failing to deny the statement and implying he might actually follow the sender's credit scam suggestion. (*Fauber, supra*, 2 Cal.4th at pp. 852-853.) Given the circumstances of the murder, the apparent discussion about the potential of being arrested and the wording of the text, it could be fairly inferred that the two were talking about obtaining money to fund Powell absconding.

We acknowledge that Powell testified he understood this message to refer to a running joke between the two about the sender capitalizing on Powell's good credit by "stealing" it and the two then "splitting" the proceeds. But, again, that Powell had an alternative explanation went to the weight, not the admissibility, of the statement.

With each of these statements, the trial court functioned in its role as gatekeeper, allowing the statements to be introduced after being satisfied that they met the necessary threshold requirements after Powell testified. The jury was left with the decision as to how to consider these statements and how much weight, if any, to afford them. Even

though the trial court did not specifically instruct on adoptive admissions,[15] like any other evidence, if the jurors chose to ignore the statements or assign them little to no weight, they were entitled to do so and the admission of the statements would then be academic. If the jurors considered the statements and assigned them any weight, they were entitled to do so.

### 3. Harmless Error

In any event, any error in the admission of the statements was harmless. The standard we apply in considering whether a state law error in admitting hearsay evidence was harmless is that set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant. (*Id*. at pp. 835-836.) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

The evidence against both Powell and Langlois was overwhelming. When J.D. called Powell after he was beaten, Powell responded: "Don't worry. We'll handle it -- come get me." (Italics omitted.) After J.D. and T.B. picked Powell up from the hotel, they all went to Powell's apartment because, according to J.D., Powell wanted to change and grab something, and according to a statement Beaman gave to law enforcement, Powell said he wanted to pick up something. Powell went inside alone. When he

---

[15] Defendants do not assert the failure to do so was error.

emerged, he had changed clothes and was wearing Converse shoes. He also had latex or surgical gloves with him. Powell directed T.B. to the house on Papaya Drive to pick up Langlois. After receiving a phone call, Langlois told J.P. that his friend had been jumped, and that he was "going to head out there to handle the problem." J.D. and T.B. picked up Langlois and J.P. and thereafter she drove Powell, Langlois, J.D., and J.P. to an area near the victim's house. All of the men got out of the car and someone told T.B. to keep the car running, which she did. The men then walked down the street.

When he recognized the house he was looking for, J.D. ran up to the house and kicked in the front door. According to J.P., Powell ran into the house behind J.D. and Langlois followed them both in. According to J.D., Powell and Langlois ran right by him into the house directly at the victim and beat him. Powell was wearing the latex or surgical gloves. J.P. saw the victim being beaten, according to him, primarily by J.D. and Powell. According to both J.P. and J.D., Langlois picked up a coffee table and hit the victim with it. Seconds after Langlois hit the victim with the coffee table, the group left.

The victim sustained three stab wounds, one of which was a fatal wound to the heart. He also sustained a number of blunt injuries to his face, arms, wrists, hand, leg, feet, and back.

After fleeing the scene and getting in T.B.'s car, J.D. saw Powell hand Langlois a knife. According to J.P., Powell called someone and told them that he "screwed up really bad." Powell told J.P. that he "threw the knife . . . [into] a bush by the car." The wound on Powell's hand suggested to J.P. that Powell had stabbed someone and the knife slipped in his hand, and Powell confirmed this by telling J.P. that the knife slipped out of his hand.

Back at the house on Papaya Drive, Langlois became threatening towards T.B., concerned she would snitch. J.P. testified that Langlois was "really mad" because nobody knew her. J.D. testified that Langlois took T.B.'s license and photographed it. A

31

photograph showing T.B.'s address was found on J.P.'s phone in a message sent from Langlois's phone. Powell made no effort to deter the conduct directed toward T.B.

Police executing a search warrant at Powell's apartment discovered a Converse shoe box, but no Converse shoes.

Powell's blood was found in T.B.'s car and at the Papaya Drive house. DNA matching the victim's DNA profile was found in T.B.'s car. One sample of the victim's blood was found on the rear side of the center console of the Volkswagen bug. Powell, J.P., and Langlois had been seated in the rear seat.

In a recorded statement to law enforcement, Christina said Langlois told her he had been helping a friend, he had helped J.D. get back at somebody, and Langlois asked her to check the computer to see if J.D. had been arrested. Langlois also expressed concern that he had left his fingerprints on something, saying he was the last person to touch it. Initially she said the object he thought his prints were on was a knife. On one occasion, Langlois, while crying, told her he had "fucked up."

Langlois sustained a fracture to his right hand commonly known as a boxer's fracture which was consistent with an injury sustained as a result of punching an object. The injury appeared to have been sustained between one week and one month prior to February 2, 2013. The victim was killed on January 5, 2013. Called on behalf of Langlois, Christina's former boyfriend said Langlois had punched him during a fight on January 15, 2013. But Langlois told the doctor who diagnosed the fracture he had punched a wall and first felt pain only about a week before the examination.

In addition to the evidence, we also note the use to which the prosecutor put the text message evidence. (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 249-250 [reviewing court may consider the use to which a prosecutor puts erroneously admitted evidence in determining whether a defendant has been prejudiced].) The prosecutor used the text message evidence to negate Powell's claim of consciousness of innocence and

32

establish consciousness of guilt.[16]  The prosecutor also used the evidence to attack

Powell's credibility, arguing that Powell could not explain in his testimony why the

sender would say "the beast is in you.  Not everybody's worthy of your beastly services,

or your freedom" if Powell had told the sender he was innocent.  Additionally, the

prosecutor argued the text evidence provided corroboration tending to connect Powell to

the crime.  No propensity or similarly prejudicial argument was made.  For example, no

argument was made that Powell was a beast and therefore he must have been the person

who stabbed the victim.  We discuss *post* the evidence tending to connect both

defendants to the crime that provides corroboration of the accomplice testimony.  At this

point, suffice it to say that the independent evidence is overwhelming and the text

messages were not critical to establishing corroboration.

Based on the other evidence before the jury and the prosecutor's argument

concerning the text messages, we conclude it is not reasonably probable that, but for the

admission of the text messages, the jury would have reached a result more favorable to

Powell or Langlois.  (*Watson, supra*, 46 Cal.2d at pp. 835-836.)  The admission of the

text messages was inconsequential and certainly less inflammatory than the evidence

indicating that defendants broke into a house, attacked the sleeping victim, stabbed him

in the heart, and hit him with a coffee table.  Indeed, even if we were to consider the

harmlessness of the asserted error under the beyond a reasonable doubt standard of

*Chapman v. California* (1967) 386 U.S. 18, 23-24 [17 L.Ed.2d 705, 710-711] (*Chapman*)

based on a confrontation clause violation which Powell implies in his briefing, but does

not expressly make, we would still conclude that the errors did not prejudice Powell or

---

[16]  As stated *ante*, on cross-examination, the prosecutor asked Powell about these text messages.  Asked whether Powell had said anything to the sender about the incident that would "qualify as 'beastly services,' " Powell responded:  "All's I told him is what I told everybody else.  I ran in there and tried to drag him out of there.  So that's what I told him."

Langlois. Based on the evidence discussed *ante*, we conclude, beyond a reasonable doubt, that any error in admitting testimony concerning the text messages did not contribute to the verdicts. (*Ibid.*)

## II. Involuntary Manslaughter Based on Voluntary Intoxication

### A. Additional Background

At the jury instruction conference, neither defense attorney requested the trial court to instruct with CALCRIM No. 580 on involuntary manslaughter as a lesser included offense. The trial court stated, "I am not instructing on voluntary manslaughter or involuntary manslaughter, and there is no evidence to support either of those. I think the parties are unanimous on that, correct?" Both defense attorneys agreed. The trial court then asked: "[M]oreover, I think both [Powell's defense attorney] and [Langlois's defense attorney], you do not even want me to instruct on that, correct?" Again, both defense attorneys agreed. After reviewing all of the jury instructions the trial court and the parties agreed would be given, the trial court asked: "Anything else we should put on the record regarding instructions?" Powell's attorney responded, "Not instructions," and Langlois's attorney, asked by the court if "[w]e have all the instructions," responded, "We do."

Regarding voluntary intoxication, the trial court instructed with CALCRIM No. 625 as follows: "You may consider evidence, if any, of a defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether a defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. [¶] A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."

34

## B. Defendants' Contentions

Both defendants assert that the trial court erred in failing to instruct the jury on the lesser included offense of involuntary manslaughter based on an impaired mental state due to drug or alcohol intoxication. Powell asserts that the obligation to so instruct existed even in the absence of a request. He asserts that, while voluntary intoxication cannot negate implied malice, it can negate express malice, and, here, the verdict likely rests in part or in whole upon a finding of express malice. Powell emphasizes that the record "contains substantial evidence of alcohol and drug abuse in the hours leading up to the . . . homicide," noting that the trial court instructed the jury on voluntary intoxication.

Langlois asserts that he was convicted under an aider and abettor theory based on the natural and probable consequences doctrine, and asserts he cannot be found guilty of a homicide more serious than that of the direct perpetrator. Therefore, according to Langlois, any error in not instructing on a lesser included offense that was prejudicial to Powell was also prejudicial as to him.

Powell further asserts that his trial counsel was constitutionally ineffective for failing to request an instruction on involuntary manslaughter based on a voluntary intoxication theory. He further claims he was prejudiced under any standard by the trial court's failure to instruct on involuntary manslaughter, maintaining that the jury found intent but not premeditation and deliberation, and therefore some degree of voluntary intoxication likely played into the jury's determination. According to Powell, in the absence of an appropriate instruction on involuntary manslaughter and corresponding verdict forms, the jury was precluded from returning a verdict on involuntary manslaughter.

## C. Trial Court's Obligation to Instruct on Lesser Included Offenses

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those

35

principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.] The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given. [Citations.] Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*People v. Breverman* (1998) 19 Cal.4th 142, 154-155 (*Breverman*).)

The trial court is required to instruct on a lesser included offense "whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury." (*Breverman*, *supra*, 19 Cal.4th at p. 162.) However, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*Ibid*.) " ' "Substantial evidence" in this context is " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*People v. Romero* (2008) 44 Cal.4th 386, 403 (*Romero*), quoting *Breverman*, at p. 162.)

Generally, involuntary manslaughter is treated as a lesser included offense to murder. (*People v. Ochoa* (1998) 19 Cal.4th 353, 422 (*Ochoa*).) As our high court has made clear, evidence of voluntary intoxication warrants an instruction on involuntary manslaughter as a lesser included offense to a charged murder only when there is substantial evidence defendant's intoxication rendered him unconscious. On this point, the court has stated: " 'Voluntary intoxication can prevent formation of any specific intent requisite to the offense at issue, but it can never excuse homicide.' [Citation.] Hence, in general at the time the defendant committed his crimes, voluntary intoxication

36

could reduce a criminal homicide to involuntary manslaughter only if the defendant was rendered unconscious:  'When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter.' "  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1227 (*Rangel*), quoting *Ochoa,* at p. 423.)  A person may be unconscious in this context when the person acts but is not conscious of acting.  (*People v. Heard* (2003) 31 Cal.4th 946, 981 (*Heard*); *Ochoa*, at p. 424; see also CALCRIM No. 3425 ["Someone is unconscious when he or she is not conscious of his or her actions"].)

## D.  Analysis

Here, although there was evidence Powell had been drinking heavily and used methamphetamine prior to the killing, there was no evidence he was unconscious or otherwise unaware of his actions.  To the contrary, the evidence demonstrated that Powell was fully aware and engaged in goal-directed conduct both before and immediately after the murder.  (See *Rangel*, *supra*, 62 Cal.4th at p. 1227; *Heard*, *supra*, 31 Cal.4th at p. 981 [involuntary manslaughter instruction appropriately rejected where according to the defendant's expert, the defendant's drug consumption only impaired judgment and precipitated a frenzied state].)

We first address the evidence related to Powell's conduct before the murder.  When J.D. called him and told him he had been beaten, Powell told J.D., "Don't worry.  We'll handle it -- come get me."  (Italics omitted.)  When he testified, Powell told the jury that J.D. reaching out to him was "perfect" because it gave him an excuse to leave the hotel and avoid embarrassment about his inability to perform sexually.  He obviously was not unconscious then.

After leaving the hotel, Powell told T.B. to drive him to his apartment.  There, he changed his clothes, put on a pair of converse tennis shoes and obtained surgical gloves,

37

in apparent anticipation of how he was planning to "handle it." He obviously was not unconscious then.

Upon returning to the car, he gave T.B. directions to another location for the apparent purpose of picking up Langlois. Thereafter, Powell got back into T.B.'s vehicle, joined by J.D., J.P., and Langlois. T.B. then drove back to the victim's neighborhood. Once there, Powell got out of the car along with the others. And when J.D. ran to the victim's door and kicked it in, Powell "ran" right behind him. Powell was obviously not unconscious then.

Upon entering the house, Powell immediately attacked the victim, who had been sleeping on the couch. During the attack, Powell was wearing the gloves he had picked up at his apartment. Powell stayed just long enough to inflict a fatal wound to the victim; he and the group were there no more than approximately 90 seconds. Then Powell ran back to T.B.'s car along with the others. Powell was obviously not unconscious then.

At some point, Powell got rid of the knife; J.D. reported he saw Powell give it to Langlois, while J.P. reported that Powell said he threw it into a bush. Powell was aware how he sustained the injury to his hand, telling J.P. the knife had slipped out of his hand. While in the car, Powell further exhibited his awareness of what he had done when he called someone and told that person he "screwed up really bad." Powell was not unconscious at that point either.

Powell's own testimony did not support a finding of intoxication establishing unconsciousness. As mentioned, he was aware J.D. gave him a good excuse to leave the hotel room. He testified he assumed J.D. wanted to see if the people who beat him up were still at the 7-Eleven location. According to Powell, he rushed into the victim's house after J.D. for the purported purpose of "drag[ging] his ass out of there." Seeing J.D. struggle with the victim, Powell said he attempted to intervene. This self-awareness and reasoning is not that of an unconscious person.

While Powell testified that he was "plastered," "hammered," and "really tying one on drinking" that night, he never testified about passing out, blacking out, or having a lapse of recall resulting from his intoxication. Indeed, throughout his trial testimony, Powell seemed to have little to no difficulty with his recall of events from that night. Describing the events in the victim's house, he did testify he did not "remember specifics of being in the house. I remember being in there. I remember being in the middle of it, and then I remember running away. That's for the most part what I remember." However, as is clear, he testified concerning what he did recall, including details leading up to entering the house, that he entered the house, and purported details once inside. The purported events he detailed concerning what happened inside of the house included seeing J.D. fighting with someone in the living room, seeing how J.D. and the victim were positioned relative to each other, trying to grab J.D. but getting thrown between them and that he "got whacked," and then running out of the house. In light of his ability to recall and describe events that occurred that night before, during, and after the attack, any purported lack of recollection concerning what happened inside appears to demonstrate merely inability to observe and recall every relevant detail during the 15- to 90-second frenetic and chaotic attack or a strategy to avoid testifying as to the truth of what he did remember. It does not describe unconsciousness resulting from intoxication.

As noted, the substantial evidence standard supporting an instruction on a lesser included offense, requires that there be " ' " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed.' " (*Romero, supra,* 44 Cal.4th at p. 403, quoting *Breverman, supra*, 19 Cal.4th at p. 162.) Neither the evidence offered in the prosecution's case-in-chief nor the evidence offered by Powell in his defense, nor a combination thereof, constitutes substantial evidence demonstrating Powell was not conscious of acting, from which a jury could conclude he committed involuntary manslaughter on a voluntary intoxication theory and not second degree murder. Both the prosecution's case-in-chief and Powell's

39

testimony demonstrate that, while Powell had been drinking and using methamphetamine that night, he was aware of the events occurring around him and was " ' "conscious of acting" ' " at all relevant times. (*Ochoa, supra*, 19 Cal.4th at pp. 423-424.) There was no evidence in the record to suggest that Powell was so intoxicated that he could be considered unconscious. Therefore, we conclude that the trial court did not err in failing to instruct the jury, sua sponte, on involuntary manslaughter.

Powell asserts that the jury necessarily rejected his account of the events, as it found he personally used a deadly weapon which inflicted the fatal wound. We agree the jury rejected his story, but Powell argues that based on the jury's rejection, we should not consider his own testimony when considering whether the trial court erred by not instructing on involuntary manslaughter based on voluntary intoxication. Based on this rationale, he further asserts that, assuming he was making up his account "to fill in a gap which he could not really remember - then there is no reason to conclude that [Powell] was actually aware of events at the time of the stabbing," and that "[d]isbelief in [Powell's] testimony does not support the contrary version advanced by respondent." In advancing this argument, Powell relies on the rule that " 'disbelief (of a witness' testimony) does not create affirmative evidence to the contrary of that which is discarded.' " (*People v. Jimenez* (1978) 21 Cal.3d 595, 613, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 509, fn. 17.)

Powell's assertions in reliance on this rule are tortured to say the least. Even assuming the validity and applicability of the rule, it only means that the jury's rejection of Powell's testimony as to what happened in the victim's house does not give rise to affirmative evidence that is contrary to his testimony. Application of this rule would not constitute substantial evidence that Powell was voluntarily intoxicated to the point of unconsciousness at the time of the killing. And as we have said, the evidence presented in the prosecution's case-in-chief demonstrates that, even though he had been drinking and using methamphetamine, Powell was aware of the events occurring around him, was

engaged in goal directed behavior and was thus " ' "conscious of acting." ' " (See *Heard, supra,* 31 Cal.4th at p. 981; *Ochoa, supra*, 19 Cal.4th at pp. 423-424.)

To say Powell's belated unconsciousness claim on appeal lacks merit is an understatement. The trial court did not abuse its discretion by not instructing on involuntary manslaughter.

### III. Flight Instructions

### A. Additional Background

In his closing argument, the prosecutor argued flight. Regarding Langlois, he stated: "The police weren't looking for him yet, and although the defense has said that these guys didn't flee -- both of them were arrested in Sacramento. That is a fact -- but what do we hear on that tape [of Christina]? [¶] He was supposed to come over to my house the day that you guys came by the first time, and he didn't, and he has cut off all contact, and I can't get a hold of him because he's not going places where the police are going to look for him. He's not fleeing from Sacramento, but you can better believe he is hiding. [¶] Why, Mr. Langlois, if you didn't do anything? That behavior makes no sense." (Italics omitted.)

Powell's attorney in closing emphasized that J.D. was in San Diego when police found him, and implied that he would not have turned himself in were he not apprehended. He further argued that J.D. demonstrated consciousness of guilt by his flight. He also argued, regarding J.D.: "First there. Last to leave. 'Cause he was so busy causing [the victim] to bleed, and he stepped in, his footprints, into the blood. That's what he was busy doing in the house. [J.D.] did it." He subsequently repeated, of J.D.: "[H]e did it. All you got to do is look at the exhibits. He did it." Powell's attorney further asserted that, "[i]f anybody is hiding and had consciousness of guilt and who can

41

be charged with murder, it would be [J.P.][17] whether he did something or not in the house . . . ." He later asserted that "[n]obody was the aggressor but" J.D. Further, Powell's attorney emphasized the fact that Powell did not flee. He stated: "So when you talk about consciousness of guilt, well, consciousness of innocence, too, when you don't run. [¶] So if you're a person you ran in this case, it means you were guilty of something, and just because you got immunity or a deal, doesn't mean you weren't guilty of something."

Langlois's attorney in his closing argument stated that J.D. "was the only one to run and hide and try to avoid being arrested at all, and he got away with it for several months. Nobody else ran. Nobody else left Sacramento. That's consciousness of guilt." He too argued J.D. was likely the one who stabbed the victim, asserting: "I submit to you, he attacked the first person he saw inside that house, and you can conclude he probably did have a knife from there or he brought it himself. He was the one who knew he had been attacked by one person with brass knuckles . . . . He knew that it was one guy he was looking for. It makes sense that he attacked the man he thought was" J.S.

In his rebuttal closing argument, the prosecutor asserted that J.D., J.P., and both defendants all had demonstrated consciousness of guilt.

At the jury instruction conference, the trial court and defense attorneys had agreed the jury would be instructed with CALCRIM No. 372 on flight. While the parties briefly discussed certain language of the instruction not relevant here, neither defense attorney objected to the jury being instructed with CALCRIM No. 372 or requested modification.

The trial court instructed the jury with CALCRIM No. 372, as follows: "*If a defendant fled* immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to

---

[17] It would appear Powell's attorney here intended to refer to J.D., not J.P., as J.D. was the person who was "hiding," first in Los Angeles and then in San Diego.

decide the meaning and importance of that conduct; however, evidence that the defendant fled cannot prove guilt by itself." (Italics added.)

## B. Defendants' Contentions

Defendants assert that the trial court erred in instructing the jury on flight as evidence of consciousness of guilt where other suspects, J.P. and J.D., also fled the crime scene, and J.D. fled Sacramento, but the flight instruction expressly applied to "a defendant" and did not include them. Defendants acknowledge that California law requires the standard flight instruction, but they emphasize that there was no instruction calling the jury's attention to the flight of individuals other than defendants. According to defendants, this shifted the burden of proof and deprived them of a fair trial by enhancing the weight accorded to their flight from the crime scene while diminishing the weight attributed to the other individuals. Defendants assert that the instruction violated due process under the circumstances of this case. Defendants note that it is permissible to request and receive an instruction pinpointing evidence of flight by individuals who are not defendants. They maintain that this error is reviewable notwithstanding the absence of an objection or request for modification because it affected their substantial rights. (See § 1259.)

## C. Trial Court's Obligation to Instruct on Defendant Flight and Instructions on Third Party Flight

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' [Citation.] These general principles of law are those 'vital to the jury's consideration of the evidence' before it." (*Rangel, supra,* 62 Cal.4th at p. 1223.)

Section 1127c provides: "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not

43

sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." " 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' " (*People v. Smithey* (1999) 20 Cal.4th 936, 982 (*Smithey*).) "If there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt,' then it is proper to instruct on flight." (*People v. Mason* (1991) 52 Cal.3d 909, 943, citing § 1127c.)

"Although a trial court is required by statute to instruct on flight when the prosecution relies on evidence of flight by a defendant as tending to show guilt [citation], there is no similar statutory requirement to instruct when the defense relies on flight by third parties. Nor does third party flight 'qualif[y] as a general principle of law vital to the jury's consideration of the evidence' such that the jury must be instructed on it even in the absence of a request." (*Rangel, supra*, 62 Cal.4th at p. 1224, fn. omitted.) A criminal defendant *may* be entitled to a pinpoint instruction on third party flight if the instruction was "properly prepared and submitted by the defense." (*People v. Henderson* (2003) 110 Cal.App.4th 737, 741 (*Henderson*).) However, a trial court has no sua sponte duty to modify the flight instruction to expressly include third party flight. (*Rangel*, at p. 1223; *Henderson*, at pp. 742-744.)

## D. Forfeiture

" '[A] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 901.) Neither defendant requested a pinpoint instruction on third party flight. Therefore, defendants have forfeited the contention that the trial court erred in

failing to give such an instruction. Additionally, as stated *ante*, a trial court has no sua sponte duty to instruct the jury on third party flight. (*Rangel, supra*, 62 Cal.4th at pp. 1223-1224; *Henderson, supra*, 110 Cal.App.4th at pp. 742-744.) To the extent that defendants contend the trial court erred in instructing the jury with CALCRIM No. 372 without modification for third party flight, they forfeited that contention because they did not object to the instruction or request any modification. (*Rangel*, at p. 1223 [finding a similar forfeiture regarding CALJIC No. 2.52, the former pattern instruction on flight].)

### E. Ineffective Assistance of Counsel

Defendants assert that their trial attorneys' failure to object to CALCRIM No. 372 and/or to request a pinpoint instruction addressing third party flight amounted to constitutionally ineffective assistance of counsel. We disagree.

To prevail on a claim premised on the ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 691-694 [80 L.Ed.2d 674, 693, 696-698] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).) " 'Surmounting *Strickland*'s high bar is never . . . easy.' " (*Harrington v. Richter* (2011) 562 U.S. 86, 105 [178 L.Ed.2d 624, 632] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, 357 [176 L.Ed.2d 284, 297].)

The reason why *Strickland*'s bar is high is because "[a]n ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve. [Citation.] . . . Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is 'all too

45

tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.' " (*Richter*, *supra*, 562 U.S. at p. 105.)

Here, defendants' trial attorneys might have decided that a third party flight instruction was unnecessary because " '[t]he logic of the inference' that such flight could also indicate consciousness of guilt on the part of third parties would have been 'plain' to jurors, even in the absence of instruction to that effect." (*Rangel, supra*, 62 Cal.4th at p. 1224.) "In addition, 'the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof.' " (*Ibid*.) Moreover, defendants' trial attorneys may have concluded that defendants' interests were better served by arguing, for example, that J.D., rather than Powell, stabbed the victim, without an instruction on third party flight. CALCRIM No. 372 expressly prohibits a conclusion of guilt based on flight alone and defendants' trial attorneys may have hoped the jury would conclude J.D. was the actual assailant based *solely* on his flight from Sacramento, a conclusion that would be impermissible under the instruction. Both Powell's and Langlois's attorneys relied heavily on J.D.'s flight and apparent consciousness of guilt in asserting that he was the person who inflicted the stab wounds.

Our high court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' " (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.) Because there are plausible satisfactory explanations for defendants' trial attorneys to have not requested an instruction on third party flight, we cannot conclude that their performance was constitutionally deficient.

Additionally, there are satisfactory explanations for trial counsel declining to ask the court to forgo instruction with CALCRIM No. 372. Among these explanations are the facts that this instruction is required under California law (§1127c), and CALCRIM

No. 372's predecessor, which is similar in substance to the CALCRIM instruction, has withstood constitutional challenges premised on due process and diminishment of the burden of proof. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 179-180, superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 62-63 & fn. 8; *Smithey, supra*, 20 Cal.4th at p. 983.) "Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile." (*People v. Price* (1991) 1 Cal.4th 324, 387.) Additionally, without the admonition in CALCRIM No. 372 telling the jury that flight is not sufficient in itself to establish guilt, there was a danger the jury would have determined defendants' guilt based solely on their flight.

It is also clear defendants were not prejudiced as a result of their attorneys' choice not to request a third party flight instruction. To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" (*Richter, supra*, 562 U.S. at p. 104.) To show prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra*, 466 U.S. at pp. 693-694; *Ledesma, supra*, 43 Cal.3d at pp. 217-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.) The likelihood of a different result must be substantial, not just conceivable. (*Richter*, at p. 112.) Here, the jury was informed that J.D. was an accomplice, he was testifying pursuant to a negotiated agreement, he had pled guilty to homicide and burglary, and he would spend 27 years in prison. The jury was also informed J.P. testified pursuant to a grant of use immunity. Additionally, the evidence made plain the fact that J.D. and J.P., like defendants, fled from the crime scene and J.D. fled from Sacramento to San Diego, and defense counsel both emphasized these facts in closing arguments, asserting that they demonstrated consciousness of guilt. Indeed, the prosecutor also told the jury J.D. and J.P. demonstrated consciousness of guilt as well as

47

defendants. Under these circumstances, defendants were not prejudiced by trial counsel not asking the trial court to instruct the jury with a third party flight instruction.

For the same reasons we have concluded counsels' performances were not deficient for failing to request a third party flight instruction, their performances were not deficient for failing to ask the trial court forego instructing with CALCRIM No. 372. Indeed, failure to so instruct would likely have been more prejudicial to defendants because the jury would not have been admonished not to conclude the defendants were guilty based solely on their flight. (See *People v. Han* (2000) 78 Cal.App.4th 797, 808 ["the purpose of the flight instruction is to protect the defendant from the jury's simply assuming guilt from flight"].)

Thus, defendants were not deprived of the constitutionally effective assistance of counsel based on their attorneys' failure to request an instruction on third party flight, or based on their attorneys' failure to request that the trial court not instruct the jury with CALCRIM No. 372.

## IV. Accomplice Testimony Instructions

### A. Additional Background

At the jury instruction conference, the trial court raised the subject of instructions regarding accomplice liability, stating: "335, accomplice defendant, no dispute, and we had discussions about 334 in terms of whether it was a question as to anybody was an accomplice and the decision was we do not need to give 334, correct?" The prosecutor responded: "My understanding was all parties and the Court agreed that [T.B.] was not -- there was no question as to whether she was an accomplice; that she was at best a 32 which does not qualify."[18] Both defense counsel stated they agreed with the prosecutor's

---

[18] The prosecutor was obviously referring to section 32, which defines the crime of accessory after the fact. That section states: "Every person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said

48

representation. The court stated that it would instruct the jury with CALCRIM No. 335, with J.D. and J.P. being the accomplices to the charged crimes,[19] but it would not instruct the jury with CALCRIM No. 334.[20]

---

principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." (§ 32.)

[19] The trial court instructed the jury with CALCRIM No. 335 as follows: "Accomplice testimony. [¶] If the crimes charged were committed, then [J.D.] and [J.P.], were accomplices to the crimes charged in this case. [¶] You may not convict a defendant of the crimes charged based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice to convict the defendant only if: [¶] 1. The accomplice's statement or testimony is supported by other evidence that you believe. [¶] 2. That supporting evidence is independent of the accomplice's statement or testimony; and [¶] 3. That supporting evidence tends to connect the defendant to the commission of the crimes. [¶] Supporting evidence, however, may be slight. It does not need to be enough by itself to prove that the defendant is guilty of the charged crime, and it does not need to support every fact mentioned by the accomplice in the statement or about which the witness testified. [¶] On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. [¶] The supporting evidence must tend to connect the defendant to the commission of the crime. [¶] The evidence needed to support the statement or testimony of one accomplice cannot be provided by the statement or testimony of another accomplice. [¶] Any statement or testimony of an accomplice that tends to incriminate a defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence."

[20] In pertinent part, CALCRIM No. 334, as it would have applied to T.B.'s testimony, would have told the jury: "Before you consider the testimony of T.B. as evidence against the defendants regarding the crimes of assault, murder, and first degree burglary, you must decide whether T.B. was an accomplice to those crimes. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against the defendant[s]. Someone is subject to prosecution if: [¶] 1. He or she personally committed the crime; [¶] OR [¶] He or she knew of the criminal purpose of the person who committed the crime; [¶] AND [¶] He or she intended to, and did in fact, aid, facilitate, promote, encourage, or instigate the commission of the crime."

In his initial closing argument, the prosecutor noted that J.P.'s and J.D.'s testimony required corroboration in order to support convictions, stating that there was no dispute that they were accomplices as a matter of law. He then discussed the evidence he believed tended to connect defendants to the crime, including DNA evidence, cell phone evidence, shoe prints at the crime scene, and the recording of the law enforcement interview with Christina. He also relied on T.B.'s testimony as corroborating evidence.

## B. Defendants' Contentions

Defendants assert that T.B. was a potential accomplice, and the trial court therefore erred in failing to instruct the jury with CALCRIM No. 334 to determine whether she was an accomplice. Defendants assert that T.B. aided and abetted in the commission of a serious felony assault, and murder was the natural and probable consequence thereof; therefore, T.B. could have been prosecuted for the victim's murder. According to defendants, had the jury been properly instructed, it would have concluded T.B. was an accomplice, and therefore her testimony could not serve to corroborate J.P.'s and J.D.'s testimony. In the absence of T.B.'s testimony as corroborating evidence, defendants assert there would have been insufficient evidence tending to connect them to the crimes, and therefore they would have been acquitted.

In addition, Langlois asserts that the only testimony tending to connect him to the crime included that of J.P., J.D., T.B., *and Powell*, all of whom were accomplices. He contends that the trial court erred in failing to give an accomplice testimony instruction as to Powell in addition to the other three.

Defendants assert that they may advance these arguments on appeal despite failing to request appropriate instructions in the trial court, first arguing that the court was under a sua sponte duty to give the instructions, and second that the failure to give the instruction affected a substantial right. (§ 1259.) And Langlois asserts that, notwithstanding case law from our high court holding that the standard of review for prejudice requires only a determination of whether there was sufficient corroborating

50

evidence independent of the accomplice testimony, we should instead evaluate prejudice under the *Watson* standard.

## C. Accomplice Testimony Principles

Section 1111 provides the statutory mandate for corroboration of accomplice testimony. It states: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall *tend to connect* the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111, italics added.) The "testimony of one accomplice cannot corroborate that of another accomplice." (*Rangel, supra*, 62 Cal.4th at p. 1222.)

The requirement that accomplice testimony be corroborated is an " ' "exception[]" to the substantial evidence' rule. [Citation.] It is based on the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' " (*People v. Romero and Self* (2015) 62 Cal.4th 1, 32 (*Romero and Self*).)

A jury may not rely upon an accomplice's testimony about the circumstances of the offense unless it "find[s] evidence that ' "without aid from the accomplice's testimony, *tend[s] to connect* the defendant with the crime.' " ' [Citation.] ' "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." ' " (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128 (*Rodriguez*); *Romero and Self*, *supra*, 62 Cal.4th at p. 32.)

Regarding the strength or weight of the necessary corroborating evidence, our high court has been clear, corroborating evidence " ' "may be circumstantial or slight and entitled to little consideration when standing alone." ' " (*Romero and Self*, *supra*, 62 Cal.4th at p. 32.) "The evidence 'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice

testifies . . . ." (*Ibid.*) " 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' " (*Id.* at pp. 32-33.)

An accomplice is defined for purposes of section 1111 as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) Thus, "[a] witness is liable to prosecution within the meaning of section 1111 if he or she is a principal in the crime." (*People v. Hinton* (2006) 37 Cal.4th 839, 879 (*Hinton*).) "Principals" to a crime are defined as "[a]ll persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . ." (§ 31.) "[M]ere 'presence at the scene of a crime or failure to prevent its commission [is not] sufficient to establish aiding and abetting.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1024.) " 'Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 430 (*Bryant, Smith and Wheeler*).) "[E]ven providing 'assistance with *knowledge* of the perpetrator's criminal purpose' is insufficient." (*Ibid.*) "An accomplice must share [] the perpetrator's criminal purpose." (*Ibid.*, italics omitted.) Also, an accessory after the fact liable under section 32 is not a principal and thus is not an accomplice as that term is used in section 1111. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 103 (*Coffman and Marlow*); *People v. Tewksbury* (1976) 15 Cal.3d 953, 960.)

"If there is evidence to permit a jury to find by a preponderance of the evidence the witness was an accomplice," the trial court must instruct on accomplice testimony. (*Hinton*, *supra*, 37 Cal.4th at p. 879.) " ' "But if the evidence is insufficient as a matter of law to support a finding that a witness is an accomplice, the trial court may make that

52

determination and, in that situation, need not instruct the jury on accomplice testimony." ' " (*Ibid*.) When there is a dispute "as to either the facts or the inferences to be drawn therefrom," the question of "[w]hether a person is an accomplice is a question of fact for the jury . . . ." (*Fauber, supra*, 2 Cal.4th at p. 834.) "The burden is on the defendant to prove by a preponderance of the evidence that a witness is an accomplice." (*Ibid*.)

### D. T.B. as an Accomplice

T.B., who previously did not know J.D., agreed to give him a ride in exchange for gas money. According to J.D., after they left 7-Eleven, they drove by the victim's house and he pointed it out to T.B., stating, "[T]hat's where that dude lives." (Italics omitted.) T.B. had just seen J.S. assault J.D. J.D. told T.B. he wanted to meet his friends at a hotel, so T.B. drove to the hotel. They picked up Powell, and T.B. drove J.D. and Powell to Powell's apartment because, according to J.D. and Beamon, Powell said he wanted to "grab something" or pick up something. T.B. then drove J.D. and Powell to the Papaya Drive house for Powell's stated purpose of picking up a friend. T.B. then drove J.D., Powell, J.P., and Langlois to the neighborhood where the victim lived. As noted, J.D. had earlier pointed out the victim's house to T.B. There, the men all got out of the car, and T.B. was told to wait for them and to keep the engine running. T.B. did as she was instructed. The group was gone for a few minutes, according to T.B. When they returned, they appeared "erratic" and shaken, and it looked to T.B. "like something happened." T.B. asked what happened, and one of the guys responded: "[S]hut up. Start driving. Get out of here." (Italics omitted.) Again, T.B. did as she was instructed. Sometime after returning to the house on Papaya Drive, T.B. drove J.D. back to the victim's neighborhood because, according to J.D., he was going to look for the knife. J.D. told T.B. to turn around and get out of there when they saw the police presence. T.B. did as she was instructed. Later in the day, after T.B. left the Papaya Drive house, she attempted to clean her car, cleaning blood from the doors and discarding tissues,

53

trash, and bandaging. T.B. testified pursuant to a grant of use immunity pursuant to section 1324.1.

We conclude that whether T.B. was an aider and abettor, and therefore an accomplice to the homicide and the burglary with which defendants were charged, presented a question of fact normally to be determined by the jury. (*Fauber, supra*, 2 Cal.4th at p. 834.) Based on the foregoing evidence and reasonable inferences that could be drawn therefrom, there was a question of fact as to whether T.B. aided and abetted the home invasion and the assault that left the victim dead by driving the participants to various locations, including to the hotel to pick up Powell, to Powell's apartment to "grab something," to pick up reinforcements on Papaya Drive, to the victim's neighborhood, having been shown the location earlier by J.D., and then wait there with the motor running after the four men left her car. In addition, given the foregoing circumstances, it was a question of fact as to whether her act of driving the group away from the scene to a place of safety, taking J.D. to look for the knife and later disposing of evidence after the fact by cleaning her car also factored into the aiding and abetting calculus.

However, T.B.'s status as an accomplice was not disputed by the parties. Both counsel for defendants agreed with the prosecution that she was not an accomplice and consequently CALCRIM No. 334 did not need to be given. As noted, our high court has observed: "Whether a person is an accomplice is a question of fact for the jury *unless there is no dispute* as to either the facts or the inferences to be drawn therefrom." (*Bryant, Smith and Wheeler*, *supra*, 60 Cal.4th at p. 430; *Fauber, supra*, 2 Cal.4th at p. 834, italics added.) On the other hand, our high court has also said: " '[A] court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are "*clear and undisputed.*" ' " (*Bryant, Smith and Wheeler*, at p. 430, italics added.) The language "clear and undisputed" suggests that a trial court must tender the question to the jury even when undisputed where the witness's status as an accomplice is not clear.

As we shall explain *post*, there was no prejudice because of the mountain of other evidence tending to connect Powell and Langlois to the crimes. Consequently, we need not decide whether, because T.B.'s status as an accomplice was not clear, the trial court erred by not instructing with CALCRIM No. 334.

### E.  Powell as an Accomplice

There is no question that, as to Langlois, Powell would be deemed an accomplice for purposes of section 1111. He was being prosecuted for the identical offense charged against Langlois in this trial in which Powell's testimony was given. Thus, there was sufficient evidence that, as to Langlois, Powell was an accomplice. Consequently, the trial court was required, on its own motion, to instruct the jury with a modified version of CALCRIM No. 334 with regard to any of Powell's testimony that was incriminating as to Langlois. (*People v. Avila* (2006) 38 Cal.4th 491, 561-562 (*Avila*); *Coffman and Marlow, supra,* 34 Cal.4th at pp. 104-106; see Bench Note to CALCRIM 334, p. 102.)[21] However, as we shall discuss *post*, we conclude the error was not prejudicial.

### F.  Determining Prejudice

Our high court has repeatedly stated: "A trial court's failure to instruct on accomplice liability under section 1111 is harmless if there is sufficient corroborating

---

[21]  As the bench note to CALCRIM No. 334 explains: "If a codefendant's testimony tends to incriminate another defendant, the court **must give** an appropriate instruction on accomplice testimony. [Citations.] … [¶]  When the witness is a codefendant whose testimony includes incriminating statements, the court **should not** instruct that the witness is an accomplice as a matter of law. [Citation.]  Instead, the court should give this instruction, informing the jury that it must decide whether the testifying codefendant is an accomplice. In addition, the court should instruct that when the jury considers this testimony as it relates to the testifying codefendant's defense, the jury should evaluate the testimony using the general rules of credibility, but if the jury considers testimony as incriminating evidence against the non-testifying codefendant, the testimony must be corroborated and should be viewed with caution." For this direction, the CALCRIM drafters cite, among other cases, *Avila*, *supra*, 38 Cal.4th at page 562 and *Coffman and Marlow*, *supra*, 34 Cal.4th at page 105.

55

evidence in the record.  [Citation.]  'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.  [Citations.]'  [Citation.]  The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' "  (*People v. Lewis* (2001) 26 Cal.4th 334, 370 (*Lewis*); accord, *People v. Anderson* (2018) 5 Cal.5th 372, 411 (*Anderson*); *People v. Manibusan* (2013) 58 Cal.4th 40, 95 (*Manibusan*); *Hinton, supra*, 37 Cal.4th at p. 880; *People v. Miranda* (1987) 44 Cal.3d 57, 100 (*Miranda*), disapproved on another ground in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)  While Langlois urges us to follow a different or additional standard for reviewing this error, as he acknowledges, we are bound by California Supreme Court precedent.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### G.  Prejudice Analysis as to Powell Regarding T.B.'s Testimony

Defendant argues he was prejudiced because the testimony of one accomplice cannot corroborate that of another.  This is well settled (*Rangel, supra*, 62 Cal.4th at p. 1222), and thus T.B.'s testimony could not be used to corroborate the testimony of J.D. and J.P.  But, contrary to Powell's contention, there was ample corroboration independent of T.B.

We first note that Powell all but ignores the fact that his own testimony provided corroboration because it "tended to connect him to the crime."  This court long ago stated:  "Sufficient corroboration may be furnished by the defendant's own testimony."  (*People v. Griffin* (1950) 98 Cal.App.2d 1, 25, disapproved on other grounds in *People v. Weiss* (1958) 50 Cal.2d 535, 566; see also *People v. Pearl* (1963) 211 Cal.App.2d 783, 789; *People v. Williams* (1954) 128 Cal.App.2d 458, 462; *People v. Jordan* (1953) 115 Cal.App.2d 452, 457; *People v. Williams* (1951) 101 Cal.App.2d 624, 628.)  Other districts recognized this rule.  (*People v. Reinard* (1963) 220 Cal.App.2d 720, 728; *People v. Singer* (1963) 217 Cal.App.2d 743, 753.)  In the many years since this court

cited this rule, no court has suggested that the obvious—a defendant's own testimony can tend to connect him to the crime—is somehow wrong. Defendant cites no such cases.[22] Powell put himself at the scene, admitted he fled the commission of the crime thereafter with the others and sewed up a knife wound instead of going to the hospital; this was evidence tending to connect him to the crime. (See *People v. Williams* (2013) 56 Cal.4th 630, 679 [evidence of the defendant's "flight after the crimes were committed supports an inference of consciousness of guilt and constitutes an implied admission, which may properly be considered as corroborative of the accomplice testimony"]; *People v. Prince* (2007) 40 Cal.4th 1179, 1257 [accomplice's testimony was corroborated in part by the accomplice's and defendant's presence together shortly after the crime]; *People v. Garrison* (1989) 47 Cal.3d 746, 773 ["evidence of flight supports an inference of consciousness of guilt and constitutes an implied admission which may properly be considered as corroborative of an accomplice's testimony"].) Even assuming Powell's own testimony did not serve as corroboration under section 1111, there is far more.

Beaman testified Powell left with J.D. and T.B. after they came to the hotel to pick him up. Beaman told Detective Gualco that, before leaving the hotel room with J.D. and T.B., Powell stated that they needed to stop by his house to pick something up.

S.H., upon waking up when everyone returned to her garage at the Papaya Drive house, saw a Volkswagen bug parked outside her house, and saw J.P., Langlois, and two other males and a female in her garage. One of the males was washing his hands in the sink, and according to S.H., "there was like blood everywhere." Based on the volume of

---

[22] Powell argues his "own testimony should not be included in this prejudice analysis, because his testimony was only necessary to rebut the prosecution's case, which under proper instructions would not have been sufficient to connect him to the crime." But Powell cites no authority for his asserted proposition or the proposition that his own testimony cannot be considered as evidence tending to connect him to the crime under section 1111.

blood, she believed that the person washing his hands was injured. She identified Powell from a photo lineup as one of the two people in the lineup that could have been the person washing his hands.

Blood found on the sidewalk near the gate at the Papaya Drive house matched Powell's DNA profile. A sample from the back seat of T.B.'s Volkswagen bug matched Powell's DNA profile, and numerous DNA samples from blood in T.B.'s car, including the back of the center console near where Powell, Langlois, and J.P. had been seated, matched the victim's DNA profile.

T.G. testified he picked up Powell and J.D. at or near the house on Papaya Drive after receiving a call from Powell. T.G. told investigators that Powell said during the call, "I don't want to talk about it over-the-phone. It's all bad." Back at his apartment, T.G. saw that Powell had a cut on his hand and a worse cut on his right leg. The two of them attempted to stitch the wound closed. After his arrest, Powell told a nurse practitioner at the jail, who noticed the wound had been sewed up with fishing line, that he sustained the injury about two weeks prior. That time frame would have coincided with the time when the murder took place.

There were repeated cell phone communications between Powell's phone and J.D.'s phone, Langlois's phone, and J.P.s' phone the night and morning of the murder.

After the killing, Powell received text messages from an unknown person, stating that the beast was in Powell, and lamenting Powell helping someone "not worthy" of his "beastly services."

Police executing a search warrant at Powell's apartment discovered a Converse shoe box, but no Converse shoes. At least six Converse shoe prints were found in the blood at the victim's house.

As our high court has repeatedly noted, the corroborating evidence may be circumstantial, and need only be "slight." (*Anderson, supra,* 5 Cal.5th at p. 411; *Romero and Self*, *supra*, 62 Cal.4th at p. 32; *Manibusan, supra,* 58 Cal.4th at p. 95; *Hinton, supra*,

37 Cal.4th at p. 880; *Lewis, supra,* 26 Cal.4th at p. 370; *People v. Frye* (1998) 18 Cal.4th 894, 966; *Miranda, supra,* 44 Cal.3d at p. 100.)  However, the evidence independent of T.B.'s testimony tending to connect Powell to the crime was far more than slight.

Taking into account all of the evidence, including the evidence of "the entire conduct of the parties, their relationship, [and] acts," (*Rodriguez*, *supra*, 4 Cal.5th at p. 1128; *Romero and Self*, *supra*, 62 Cal.4th at p. 32), we conclude that this evidence was more than sufficient to satisfy the corroboration requirement of evidence tending to connect Powell with the crimes charged so as to satisfy the jury that J.D., J.P., and T.B. were telling the truth.  (§ 1111; *Anderson, supra,* 5 Cal.5th at p. 411; *Manibusan, supra,* 58 Cal.4th at p. 95; *Hinton, supra*, 37 Cal.4th at p. 880; *Lewis, supra,* 26 Cal.4th at p. 370; *Miranda*, *supra*, 44 Cal.3d at p. 100.)  Therefore, we conclude Powell was not prejudiced by the trial court not instructing with CALCRIM No. 334 regarding T.B.'s testimony.[23]

**H.  Prejudice to Langlois Regarding the Testimony of T.B. and Powell**

When S.H. woke up at 6:30 or 7:00 a.m. on the couch in her garage after earlier passing out, she heard Langlois outside say something like, "she's passed out.  Perfect." That statement reflected a conscious of guilt as it suggested he was glad she might not see what was about to happen in her garage.  However, thereafter, S.H. saw J.P. and Langlois, two other males, and a female in her garage.  Through her home surveillance camera, she saw a Volkswagen bug convertible, which is what T.B. drove, parked in

---

[23]  This is not a close case.  Our conclusion would be the same even if we were required to apply the *Watson* test as Powell contends.  As we have noted, under *Watson*, we determine whether it is reasonably probable that, but for the error, the jury would have reached a result more favorable to defendant.  (*Watson*, *supra*, 46 Cal.2d at pp. 835-836.) Focusing as we must on what a reasonable jury is likely to have done in the absence of the error, we would conclude there is no reasonable probability the error of which the defendant complains affected the result.  (*Beltran*, *supra*, 56 Cal.4th at p. 956.)

front of the house.  As noted, blood containing DNA matching the DNA profiles of Powell, J.D., and the victim was later found in T.B.'s Volkswagen bug.

S.H. saw a man she did not know washing his hands in the sink and concluded he was injured given the volume of blood.  As noted, S.H. selected Powell's photograph from a photo lineup as one of two individuals who could have been the man washing his hands in the sink.  S.H. testified that Langlois was trying to help that man clean his hands.  When S.H. asked Langlois, "Chris what the heck," he told her to "shut up."  S.H. testified that later, the man at the sink and a "hyper" individual with a cut on his head left when someone (whom she identified by the same first name as that of T.G.) arrived in a truck.  Langlois and J.P. remained at her house for some time.

Langlois later made incriminating statements to his then-girlfriend (now wife), Christina, which tended to connect him to the crimes.  He told her he had been helping a friend, he had helped J.D. get back at somebody, and he had "fucked up."  He expressed concern because he had left his fingerprints on something, saying he was the last person to touch it.  Christina initially said the object Langlois thought his prints were on was a knife.  Langlois repeatedly asked Christina to check on the computer to see if J.D. had been arrested.  Additionally, Langlois told Christina a female he had never met before had been driving them.

Langlois exhibited consciousness of guilt after speaking to Christina.  She said Langlois did not contact her after law enforcement had first come to her house, not even a phone call or a text.  Prior to that she had asked him, "Why are you hiding?  It makes you look bad."  Although Gualco looked for Langlois after he became a person of interest, Langlois was not arrested until approximately one month after the killing.

After he was arrested, Langlois was diagnosed with a fracture on his right hand commonly known as a boxer's fracture which was consistent with an injury sustained as a result of punching an object.  The doctor who examined him opined that the injury was between one week and one month old, which would have coincided with the home

60

invasion, beating, and stabbing of the victim. Langlois called Christina's former boyfriend to testify that Langlois had punched him during a fight on January 15, 2013. But that story was inconsistent with what Langlois told the doctor who diagnosed the fracture; Langlois told the doctor he had punched a wall and first felt pain about a week before the examination, which was on February 2, 2013.

As noted, there were repeated cell phone communications between Powell's phone and J.D.'s phone, Langlois's phone, and J.P.s' phone the night and morning of the murder. A photograph showing T.B.'s address and her father's name was found on J.P.'s cell phone in a message sent from Langlois's phone.

Again, taking into account all of the evidence, including the evidence of "the entire conduct of the parties, their relationship, [and] acts," (*Rodriguez*, *supra*, 4 Cal.5th at p. 1128; *Romero and Self*, *supra*, 62 Cal.4th at p. 32), we conclude that the evidence, independent of the accomplice testimony of T.B. and Powell, was more than sufficient to connect Langlois with the crimes charged. (*Anderson, supra*, 5 Cal.5th at p. 411; *Manibusan, supra*, 58 Cal.4th at p. 95; *Hinton, supra*, 37 Cal.4th at p. 880; *Lewis, supra*, 26 Cal.4th at p. 370; *Miranda, supra*, 44 Cal.3d at p. 100.) Therefore, we conclude that Langlois was not prejudiced by the trial court's failure to provide accomplice testimony instructions as to T.B. and Powell.[24]

### V. Aiding and Abetting Implied Malice Murder

### A. Additional Background

At the jury instruction conference, the trial court listed instructions on aiding and abetting and the natural and probable consequences doctrine, stating: "Aiding and abetting, 400, 401, and then 403, natural and probable consequences, and the target

---

[24] As with Powell, our conclusion would be the same even if we were required to apply the *Watson* test for harmless error. (*Beltran, supra,* 56 Cal.4th at p. 956; *Watson, supra,* 46 Cal.2d at pp. 835-836; see fn. 23, *ante*.)

offense was assault with force likely to produce great bodily injury. The non-target offense becomes the murder. [¶] Anybody see something in 403 that should be brought up?" Neither defense attorney raised any objection to any of these instructions.

The trial court instructed the jury with CALCRIM No. 401 as follows: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following: [¶] 1. The perpetrator committed the crime. [¶] 2. The defendant knew that the perpetrator intended to commit *the crime*. [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing *the crime*; and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of *the crime*. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*. [¶] If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and abettor; however, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself make him an aider and abettor." (Italics added.)

The court instructed the jury with CALCRIM No. 403, as follows: "One possible theory of homicide liability is under a doctrine called natural and probable consequences. Under this aiding and abetting theory before you may decide whether a defendant is guilty of murder, you must decide whether he is guilty of assault with force likely to produce great bodily injury. [¶] To prove that a defendant is guilty of murder, the People must prove that, under this theory: [¶] The defendant is guilty of assault with force likely to produce great bodily injury, number one. [¶] 2. During the commission of assault with force likely to produce great bodily injury, a co-participant in that assault

62

with force likely to produce great bodily injury committed the crime of murder; and  [¶]  3. Under all of the circumstances a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the assault with force likely to produce great bodily injury.  [¶]  A co-participant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  [¶]  …  [¶]  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  In deciding whether a consequence is natural and probable consider all of the circumstances established by the evidence.  [¶]  If the murder was committed for a reason independent of the common plan to commit the assault with force likely to produce great bodily injury, then the commission of murder was not a natural and probable consequence of assault with force likely to produce great bodily injury.  [¶]  To decide whether the crime of murder was committed, please refer to the separate instructions that I will give you on that crime.  [¶]  If you decide that the defendant aided and abetted assault with force likely to produce great bodily injury, and murder was a natural and probable consequence of that crime, the defendant is guilty of second degree murder."

The court instructed on malice with CALCRIM No. 520 as follows: "There are two kinds of malice aforethought:  [¶]  Express malice and implied malice.  [¶]  Proof of either is sufficient to establish the state of mind required for murder.  [¶]  The defendant acted with express malice if he unlawfully intended to kill.  [¶]  The defendant acted with implied malice if:  [¶]  1.  He intentionally committed *an act*; 2.  The natural and probable consequences of *the act* were dangerous to human life; 3.  At the time *he acted*, he knew *his act* was dangerous to human life and 4.  He deliberately acted with conscious disregard for human life."  (Italics added.)

In his closing argument, the prosecutor advanced two theories of liability as to Langlois:  (1) direct aiding and abetting express malice murder, and (2) indirect or

63

extended liability for the natural and probable consequences of the assault Langlois aided and abetted. The prosecutor did not advance an implied malice theory as to Langlois.

However, the prosecutor did discuss implied malice as to the person who committed the stabbing. He first identified basic facts he thought related to the intentional act, the life endangering nature of that act, and the conscious disregard for human life. He told the jury: "1. You did an intentional act. In this case that would be the stabbing. [¶] 2. That act is dangerous to human life. Obviously, using a knife on a human is dangerous; and [¶] 3. The act shows a conscious disregard of the danger to life. [¶] We can expand this a little bit. [¶] Four guys posse up, go over to a house, kick in a door in the middle of the night, even without a knife that seems like an inherently dangerous act. It seems like somebody might die. Seems like you don't really care about the consequences, even without a knife."

In explaining liability for second degree murder, the prosecutor told the jurors that defendants "can be guilty in a couple of different ways," as a "perpetrator, in this case the stabber, or you can be an aider and abettor of a lesser crime that's likely to end up with somebody dead." He then went on to say, "So what does that look like? [¶] As the perpetrator, and in this case it would be [] Powell is the stabber and/or [] Langlois throwing the table, a defendant did an act that caused [the victim's] death, and the defendant had malice aforethought. This does not mean that []Langlois had to do an act that caused a death because he can aid and abet a second degree murder, and we will talk about that, *so long as he has the intent to aid and abet a murder… He would have express malice under this because he – he has to basically adopt… He has to adopt the intent to kill.* [¶] *Or you can aid and [a]bet, in this case, an assault . . . . [¶] If you aid and abet or participate in an assault with force likely to cause great bodily injury and during the assault somebody commits murder, and the murder is likely that somebody might try to do that or do that under the circumstances, then the law says you can be*

*guilty of murder even though all you wanted to do was go over and commit an assault*."
(Italics added.)

The prosecutor continued, "So here is what that looks like in your analysis when you start talking about the evidence.  Step one:  Was there an assault?  [¶]  And you are going to break it up by defendant, okay?  [¶]  When I am talking about all this natural and probable consequence stuff, which is what this is called, I'm only talking about []  Langlois, okay?  I'm comfortable that you guys are going to go back there and say *Powell is the stabber*.  [H]e is guilty on a direct perpetrator theory… but when I'm talking about this, we are talking about an alternative way for [] Langlois to be guilty of murder even as a non-stabber, even if you find he didn't go over there with the intent to kill or intent to aid and abet a killing.  [¶]  The *baseline* for [] Langlois, the bottom level you guys can get to, is he went over there with intent to inflict violence, four on one, and somebody died."  The prosecutor further stated:  "So was [] Langlois guilty of an assault as either a perpetrator or an aider and abettor?  [¶]  Of course he was. Why would [J.P.] say his buddy [] Langlois, threw a table on the guy if he didn't?  [¶] … [¶]  [] Langlois committed an assault."  The prosecutor emphasized that not only did Langlois intend to aid and abet in the assault, he personally committed an assault and he went along as "back-up."  (Italics added.)

But the prosecutor argued Langlois was also liable under an express malice theory. He argued that the group must have been armed when they entered the victim's house, because they had to anticipate the occupants might be armed.  He emphasized, "You don't go into somebody's else's living room not knowing what you might face and unprepared to face it.  [¶] That's just common sense."  He argued that Langlois could have harbored an intent to kill before the group entered the house, but he also could have formed the intent to kill during the assault.  He told the jury:  "A perfectly reasonable analysis of the facts in this case would be:  [¶]  Let's assume [] Langlois had no idea that there was a knife before they go in the house, but they kick in the door.  [] Powell

65

commences his stabbing, and while the crime is going on … [] Langlois sees all of the blood and adopts that conduct by picking up a table and chucking it at [the victim] as he lay defenseless on the floor. [¶] Does that indicate to you an intent to kill? I think it should."

## B. Langlois's Contentions

Langlois asserts that the manner in which the trial court instructed permitted the jury to convict him as a direct aider and abettor of an implied malice murder, independent of the natural and probable consequences doctrine. He argues that this is an invalid theory of murder. According to Langlois, it is not possible to directly aid and abet implied malice murder because "direct aiding and abetting liability turns on the specific intent of the aider and abettor, and implied-malice murder is a crime that is proven not in reference to the intended result but in reference to the unintended result of sufficiently dangerous conduct." He contends that "[g]uilt as a direct aider and abettor of implied-malice murder is not a proper theory of guilt under California law." Therefore, according to Langlois, the trial court's instructions allowed the jury to find him guilty of murder on a legally invalid theory. Neither Langlois nor the People cite a published case directly addressing this argument, and we are aware of none.

## C. General Standard of Review and Forfeiture

"We determine independently whether a jury instruction correctly states the law. [Citation.] Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law." ' [Citation.] We consider the instructions as a whole as well as the entire record of trial, including the arguments of counsel. [Citation.] If reasonably possible, instructions are interpreted to support the judgment rather than defeat it." (*People v. McPheeters* (2013) 218 Cal.App.4th 124, 132 (*McPheeters*).)

Contrary to the Attorney General's contention, despite the fact that Langlois failed to object on this basis in the trial court, he has not forfeited this instructional error contention. Because Langlois's contention is that the instructions caused him to be

convicted under an invalid legal theory, this contention need not be preserved by objection in order to be considered on appeal. (*People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7 [generally, a defendant forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if he fails to object in the trial court, but a defendant does not forfeit a claim that the instruction was not correct in the law]; *McPheeters, supra*, 218 Cal.App.4th at p. 132 [same].)

### D. Analysis

"All persons concerned in the commission of a crime, ... whether they directly commit *the act constituting the offense*, or aid and abet in its commission, ... are principals in any crime so committed." (§ 31, italics added; *People v. Mendoza* (1998) 18 Cal.4th 1114, 1122.) Guilt as an aider and abettor is guilt "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*).)

Under the law in effect at the time of the murder here, an aider and abettor could be convicted for second degree murder committed by the direct perpetrator under two alternative theories: (1) a defendant with the necessary mental state could be liable under direct aiding and abetting principles, or (2) a defendant could be liable not only for the intended crime, but also for any offense that was the natural and probable consequences of the crime aided and abetted. (*People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*); *McCoy, supra*, 25 Cal.4th at pp. 1117-1118.)[25] Thus, at the time of the instant murder,

---

[25] In 2018, the Legislature eliminated application of the natural and probable consequences doctrine to murder. (Senate Bill No. 1437 (2017-2018 Reg. Sess.) (S.B. 1437).) We granted Langlois's request for supplemental briefing on S.B. 1437. Contrary to Langlois's contentions in his supplemental briefing, the relevant changes resulting from the enactment of S.B. 1437 do not apply retroactively to defendants who have pending appeals. Rather, S.B. 1437 established an exclusive mechanism for retroactive relief set forth in section 1170.95. (*People v. Gentile* (2020) 10 Cal.5th 830, 839

under the natural and probable consequences doctrine, a person who aided and abetted only an intended assault could be found guilty of second degree murder, even if unintended, if the murder was a natural and probable consequence of the intended assault. (*McCoy*, at p. 1118)  Whether the nontarget crime was a natural and probable consequence was to be determined from the perspective of a reasonable person.  (*Chiu*, at pp. 161-162; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1431-1432 (*Rivas*).)  "The inquiry [did] not depend on whether the aider and abettor actually foresaw the nontarget offense.  [Citation.]  Rather, liability ' "[was] measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " (*Chiu*, at pp. 161-162.)  Thus, under the natural and probable consequences doctrine, the prosecution was not required to prove that the aider and abettor was subjectively aware of the risk of death and acted in conscious disregard thereof.[26]

---

(*Gentile*).)  Nothing we say herein is intended to express an opinion as to the appropriate outcome on a section 1170.95 petition should Langlois choose to file one.

[26] The reason why there is a dearth of decisional law on aiding and abetting implied malice murder may be the heretofore availability of the natural and probable consequences doctrine for second degree murder, which was easier to prove.  While, like implied malice, part of the analysis is based on the natural and probable consequences of an act, the natural and probable consequences doctrine did not require that the aider and abettor intend to aid the perpetrator in committing a life endangering act; it only required the aider and abettor to intend to aid the perpetrator in committing a specific target offense, the natural and probable consequences of which offense was a non-target crime. What was natural and probable was judged by an objective standard and it was enough that murder was a reasonably foreseeable consequence of the crime aided and abetted. (*Chiu*, *supra*, 59 Cal.4th 161-162; *Rivas*, *supra*, 214 Cal.App.4th at pp. 1431-1432.)  The aider and abettor need not have been subjectively aware of the risk to human life.  Thus, because it was unnecessary to prove the aider and abettor intended to aid the perpetrator's commission of a life endangering act and that he or she was aware of the risk to human life, it was much easier to prove that murder was the natural and probable consequences of an intended assault than to prove direct aider and abettor liability for an implied malice murder.

Langlois asserts that "[a]iding and abetting murder requires specific intent to kill." However, there is no authority for the proposition that an aider and abettor of second degree implied malice murder must intend to kill. It is, of course, well-settled that a direct perpetrator can be guilty of murder based on implied malice -- a theory that does not require an intent to kill. Application of aiding and abetting principles to the actus reus and mens rea elements of implied malice murder demonstrates that a person can also be culpable of implied malice murder on an aiding and abetting theory.

To understand aiding and abetting an implied malice murder, one must understand the analytical connection between *the act* or the actus reus and the mens rea elements of direct aiding and abetting liability and the actus reus and mens rea elements of implied malice murder. In *McCoy*, *supra*, 25 Cal.4th 1111, our high court addressed the issue of whether an aider and abettor could be guilty of greater homicide-related offense than the actual perpetrator. (*Id*. at p. 1114.) In doing so, the court discussed aiding and abetting principles and the necessary focus on the actus reus and mens rea elements of the homicide offense. That discussion is pertinent here.

The *McCoy* court observed that "[e]xcept for strict liability offenses, every crime has two components: (1) an act or omission, sometimes called the actus reus; and (2) a necessary mental state, sometimes called the mens rea. [Citations.] This principle applies to aiding and abetting liability as well as direct liability. An aider and abettor must do something *and* have a certain mental state." (*McCoy*, *supra*, 25 Cal.4th at p. 1117.) The court went on to state: "We … conclude that when a person, with the mental state necessary for an aider and abettor, helps or induces another to kill, that person's guilt is determined by the combined acts of all the participants as well as that person's own mens rea." (*Id*. at p. 1122.)

Langlois asserts that "it is not possible *directly* to aid and abet implied-malice murder, for the reason that direct aiding and abetting liability turns on the specific intent of the aider and abettor, and implied-malice murder is a crime that is proven not in

reference to the intended result but in reference to the unintended result of sufficiently dangerous conduct." He argues that aiding and abetting murder requires the specific intent to kill, which cannot be reconciled with aiding and abetting implied malice murder. According to Langlois, because aiding and abetting requires a specific intent, while implied malice murder has only the mental state of subjective awareness of the dangerousness of one's conduct, a coparticipant cannot directly aid and abet implied malice murder. In other words, because implied malice does not require an intent to kill, a person cannot aid and abet an implied malice murder. He contends an aider and abettor can only be liable for implied malice murder under the natural and probable consequences doctrine. Langlois misapprehends what is required by a direct aider and abettor in the context of implied malice murder.

As the court in *McCoy* made clear, direct aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. (*McCoy*, *supra*, 25 Cal.4th at p. 1122.) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act.[27] For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.[28]

---

[27] The relevant act is the act that proximately causes death. (*People v. Cravens* (2012) 53 Cal.4th 500, 507 (*Cravens*); *People v. Knoller* (2007) 41 Cal.4th 139, 143.)

[28] Our high court has often referred to the actus reus element as the "physical component" of implied malice and the mens rea element as the "mental component" of

That one may intentionally aid a perpetrator in doing an act when he or she knows the act naturally and probably will cause death and consciously disregards this probable result was recognized by our high court in *Gentile, supra*, 10 Cal.5th 830. In distinguishing liability under the natural and probable consequences doctrine, the court in *Gentile* stated that "an aider and abettor need not personally possess malice, express *or implied*, to be convicted of second degree murder under a natural and probable consequences theory." (*Id*. at p. 847, italics added.) This language clearly suggests an aider and abettor can be liable for implied malice murder as a theory independent of the natural and probable consequences doctrine. Later in the opinion, after referencing direct aider and abettor liability for an express malice murder, the *Gentile* court went on to note that "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life."[29] (*Id*. at p. 850.)

---

implied malice. (*People v. Bryant* (2013) 56 Cal.4th 959, 965; *Cravens, supra*, 53 Cal.4th at p. 508; *People v. Chun* (2009) 45 Cal.4th 1172, 1181 (*Chun*).)

[29] The context in which the court made this statement was as follows. The San Diego County District Attorney as amicus curiae argued that, after the passage of S.B. 1437, our high court should adopt a hybrid version of the natural and probable consequences doctrine, modifying the natural and probable consequences doctrine for murder rather than eliminating it. (*Gentile*, *supra*, 10 Cal.5th at pp. 849-851.) In making this argument, the District Attorney cited the facts in two unpublished cases as examples justifying a hybrid approach. (*Id*. at pp. 849-850.) The *Gentile* court rejected the argument, reasoning that: "second degree murder in both cases might have been pursued under a direct aiding and abetting theory. Such a theory requires that 'the aider and abettor ... know and share the murderous intent of the actual perpetrator.' (*McCoy*, *supra*, 25 Cal.4th at p. 1118.) For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' " 'knows that his conduct endangers the life of another and ... acts with conscious disregard for life.' " ([*People v.*] *Soto* [(2018)] 4 Cal.5th [968,] 974 [(*Soto*)].) Therefore, *notwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with*

71

Based on the foregoing analysis of the relevant actus reus and mens rea, we reject Langlois's contention that direct aiding and abetting implied malice murder is an invalid legal theory. Thus, if there was error here, it was not because the court instructed on an invalid theory of liability. We note, however, that the instructions given here were not tailored for this theory.

Langlois points out the language of the standard aiding and abetting instruction given here, CALCRIM No. 401. He emphasizes that this instruction couches direct aiding and abetting liability in terms of the aider and abettor knowing the perpetrator intended to commit *the crime*, the aider and abettor intending to aid and abet the perpetrator in committing *the crime*, and that, by words or conduct, the aider and abettor in fact aided the perpetrator's commission of *the crime*. As relevant here, "the crime" would be murder. But as we have discussed, the aider and abettor of implied malice murder need not intend the commission of *the crime* of murder. Rather, relative to the aider and abettor's intent, he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life.

Because the application of aiding and abetting liability for implied malice murder as to Langlois was not foreclosed by the instructions and the aiding and abetting instructions here were not tailored for implied malice murder, the instructions were erroneous. However, we conclude the error was harmless.

---

*conscious disregard for life.*" (*Gentile*, at p. 850, italics added.) In *Soto*, the case the court cited for the mens rea element of implied malice, the defendant and victim engaged in a knife fight. (*Soto*, at p. 971.) The case involved the question of whether evidence of voluntary intoxication is permitted on the question of whether a defendant believed it necessary to act in self-defense (*id*. at p. 970), and did not involve aiding and abetting liability.

Langlois contends that, because the theory was legally invalid, the *Chapman* harmless beyond a reasonable doubt standard applies. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]; *People v. Aledamat* (2019) 8 Cal.5th 1, 3, 13 (*Aledamat*) [when a trial court instructs the jury on alternative theories of guilt and at least one theory is legally erroneous, the *Chapman* standard applies].) We have determined that the theory Langlois complains of was not legally invalid, but nevertheless apply *Chapman* in a situation involving erroneous aiding and abetting instructions. (*People v. Howard* (1992) 1 Cal.4th 1132, 1173; *People v. Dyer* (1988) 45 Cal.3d 26, 64; *People v. Sarkis* (1990) 222 Cal.App.3d 23, 29.)

Under *Chapman*, "[t]he reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and *considering all relevant circumstances*, it determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 3, italics added.) Under *Chapman*, the People must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman*, *supra*, 386 U.S. at p. 24; *Aledamat*, at pp. 12-13 ["Finding beyond a reasonable doubt that the error did not contribute to the verdict is essentially the same as finding the error harmless beyond a reasonable doubt"].) " 'To say that an error did not contribute to the ensuing verdict is ... to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " (*People v. Neal* (2003) 31 Cal.4th 63, 86 (*Neal*).) In other words, the *Chapman* harmless error inquiry asks: " 'Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?' " (*People v. Geier* (2007) 41 Cal.4th 555, 608 (*Geier*); accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1159.) Since *Chapman*, our high court has " 'repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.' " (*Geier,* at p. 608.)

Of key importance to our determination that the instructional error here was harmless is the fact that the prosecutor did not rely on direct aiding and abetting liability as to implied malice. He never advanced such an argument. As noted, the prosecutor advanced just two theories of liability as to Langlois: (1) direct aiding and abetting express malice murder, and (2) indirect or extended liability for the natural and probable consequences of the assault Langlois aided and abetted.

Courts look to the prosecutor's argument as a relevant circumstance in determining whether instructional error is harmless. For example, in *Aledamat, supra*, 8 Cal.5th 1, the defendant was charged with assault with a deadly weapon, a box cutter. The trial court had listed two theories for the jury to consider in determining whether the box cutter was a deadly weapon: (1) that the box cutter was inherently deadly or dangerous, an invalid legal theory because box cutters are not inherently deadly or dangerous, and (2) that defendant used the box cutter in a deadly or dangerous way, a valid legal theory. (*Id*. at p. 3.) As a circumstance establishing the error was harmless under *Chapman*, the court observed that the deadly weapon issue was not argued to the jury as two separate theories, noting "no one ever suggested to the jury that there were two separate ways it could decide whether the box cutter was a deadly weapon." (*Id*. at p. 14.) Similarly, here, the prosecutor never argued an implied malice theory as to Langlois.[30] Under the circumstances of this case, given that the jury was never steered in that direction, it is clear the jurors were persuaded by one or both of the prosecutor's arguments -- that Langlois aided and abetted an express malice murder or that he was liable for the natural and probable consequences of an assault he aided and abetted. (See

---

[30] This case presents a far different situation than where the prosecutor argued both an invalid theory and a valid theory to the jury. (Cf. *In re Martinez* (2017) 3 Cal.5th 1216, 1226-1227 [reasoning its conclusion that the instruction on the invalid theory was not harmless beyond a reasonable doubt was bolstered by the fact the prosecutor argued the invalid theory at length during closing argument].)

*People v. Prettyman* (1996) 14 Cal.4th 248, 271-273 (*Prettyman*); *Rivas*, *supra*, 214 Cal.App.4th 1431-1434.)[31]

There was compelling evidence that supported both theories advanced by the prosecution here. As for direct aiding and abetting an express malice murder, the evidence supported a finding that Langlois shared the intent to kill with the stabber, Powell. J.D. testified that when he told Powell about having suffered a beat down, Powell said, "*we'll* handle it – come and get me." (Italics added.) The evidence indicated Powell recruited Langlois to help him handle it. Powell had been told that J.D.

---

[31] In *Prettyman*, the trial court instructed on the natural and probable consequences theory regarding a codefendant's liability as an aider and abettor, but did not identify and define the target crime. (*Prettyman, supra*, 14 Cal.4th at p. 263.) The court concluded the error was harmless under the standard applied for ambiguous instructions -- whether there is a reasonable likelihood that the jury misapplied the instructions. (*Id*. at pp. 271-273.) Because the prosecutor argued that the defendant was liable as a direct aider and abettor, intending the victim's death, and did not argue the natural and probable consequences doctrine as a theory of liability, the *Prettyman* court concluded it was "highly unlikely" the jury convicted based on that theory. (*Id*. at p. 273.) The court reasoned, "it appears that the jury was persuaded by the prosecutor's argument that [the aider and abettor] encouraged or assisted the codefendant . . . to murder [the victim], and thus was guilty of murder as an accomplice to that crime, not as an accomplice to some other unlawful act of which the murder was a natural and probable consequence." (*Ibid*.) Consequently, the error associated with the natural and probable consequences instruction was harmless.

*Rivas*, *supra*, 214 Cal.App.4th 1410, involved a similar situation, where the prosecutor did not argue the problematic theory. There, the trial court instructed that, " '[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime,' " but never instructed on the natural and probable consequences doctrine, which would have identified the specific circumstances referenced by the trial court. (*Id*. at pp. 1431-1432.) However, the prosecutor never relied on that theory of liability in argument to the jury. Addressing both federal constitutional and state law claims, and relying on *Prettyman*, the *Rivas* court held: "[b]ecause the prosecutor . . . did not rely on the natural-and-probable-consequences doctrine, [defendant's] constitutional and state law claims are without merit." (*Id*. at p. 1434.)

was beaten with brass knuckles. Therefore, it would have been reasonable to infer the group would encounter armed resistance to their payback, at least with brass knuckles. Langlois told J.P. a friend of his had been jumped and he was "going to head out there to handle the problem." Langlois then participated in a dangerous home invasion for the purpose of inflicting violence with Powell, who stabbed the victim with a knife moments after their forced entry. Thus, the evidence supports the conclusion that, even before the home invasion commenced, Langlois intended that someone be killed. Further, given that Langlois struck the victim with a table while the victim was on the floor on all fours, bleeding heavily, that evidence further contributed to an inference Langlois intended that the victim die, an intent he had before he entered or that developed during the stabbing.

Additionally, the evidence clearly supported liability under the natural and probable consequences doctrine in that Langlois aided and abetted the group assault on the victim and the murder was a reasonably foreseeable consequence given the totality of the circumstances. At oral argument, the Attorney General argued that, because direct aiding and abetting implied malice requires subjective risk awareness and natural and probable consequences murder requires objective risk awareness, the jury would not have needed to go beyond the natural and probable consequences theory to find defendant guilty of second degree murder. Counsel for Langlois candidly made a similar argument, noting that jury never had to "get into these complex malice questions" regarding Langlois given the availability of the natural and probable consequences theory.

We agree. Given the relative ease with which the jury could conclude Langlois was liable for second degree murder under the natural and probable consequences doctrine (see fn. 26, *ante*) and the prosecutor's overture to start with Langlois aiding and abetting an assault as a "baseline," we conclude the fact that the direct aiding and abetting instruction was not tailored for implied malice murder, a theory not advanced by the prosecution, did not contribute to the verdict. (*Aledamat, supra*, 8 Cal.5th at pp. 12-13.) There was simply no reason for the jury to deviate from the prosecutor's suggested path

76

and find defendant guilty based on implied malice, a far more difficult route to a second degree murder verdict than the natural and probable consequences doctrine. We agree with the Attorney General that the jury would have found natural and probable consequences liability (objective risk awareness) before moving to aiding and abetting implied malice liability (subjective risk awareness). Indeed, under the circumstances presented here, no juror could have reasonably found implied malice if properly instructed without also finding second degree murder liability for the natural and probable consequences of an assault. (See *Chun, supra,* 45 Cal.4th at pp. 1179, 1205 [concluding that a second degree felony murder theory was an invalid theory, but further concluding that no juror could find the defendant (who admittedly fired shots) guilty of second degree felony murder as either a shooter or aider and abettor "without also finding conscious-disregard-for-life malice"; thus, the instructional error was harmless beyond a reasonable doubt].)

Having examined "the entire cause, including the evidence, and consider[ed] all relevant circumstances" (*Aledamat, supra*, 8 Cal.5th at p. 3), we conclude that a rational jury would have found Langlois guilty of second degree murder absent the instructional error. (*Geier, supra*, 41 Cal.4th at p. 608.) The error was "unimportant in relation to everything else the jury considered on the issue" of Langlois's liability for second degree murder. (*Neal, supra*, 31 Cal.4th at p. 86.) The erroneous instruction "did not contribute" to the verdict. (*Aledamat*, at pp. 12-13.) Consequently, any error in this regard was harmless beyond a reasonable doubt. (*Chapman*, *supra*, 386 U.S. at p. 24.)

## VI. CALCRIM No. 620 – Causation

### A. Additional Background

As we have noted, the prosecution advanced two theories of Langlois's liability for second degree murder: (1) direct aiding and abetting express malice murder, and (2) extended liability for the natural and probable consequences of the assault Langlois aided and abetted. The prosecutor also argued to the jury: "[a] defendant committed an act that

77

caused [the victim's] death. [¶] Okay. That is proven no matter what version of events you believe because somebody stabbed him . . . ." He further stated: "cause of death is not in issue in this case . . . . He died of the stab wound to his left chest . . . ."

Regarding Langlois's role relative to Powell, the prosecutor argued: "As the perpetrator, and in this case it would be [] Powell is the stabber and/or [] Langlois throwing the table, a defendant did an act that caused [the victim's] death, and the defendant had malice aforethought. *This does not mean that [] Langlois had to do an act that caused a death* because he can aid and abet a second degree murder, and we will talk about that, so long as he has the intent to aid and abet a murder . . . . He would have to have express malice under this because he -- he has to basically adopt . . . . He has to adopt the intent to kill." (Italics added.)

At the jury instruction conference, neither defense attorney requested that the jury be instructed with CALCRIM No. 620 on causation.**32**

### B. Langlois's Contentions

Langlois contends that the prosecutor argued to the jury that he could be liable for directly aiding and abetting the murder by assaulting the victim with the table. He argues that "[t]he prosecutor communicated to the jury clearly that [] Langlois's infliction of injuries on [the victim] was an act of murder. Yet the trial court failed to instruct under CALCRIM No. 620, 'Causation: Special Issues.' " He further argues that, "[b]ased on the manner in which the prosecutor argued the case to the jury, an instruction based on

---

**32** Under the circumstances of this case, CALCRIM No. 620 would have stated: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] . . . [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find (him/her) not guilty."

CALCRIM No. 620 was required," and thus the trial court had a sua sponte duty to so instruct.

Langlois further asserts that he was prejudiced by the trial court's error because it relieved the jury from its obligation to make a finding on the element of causation. (See *In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 375] ["the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"]; *People v. Loy* (2011) 52 Cal.4th 46, 72 ["The prosecution does, indeed, have to prove all necessary elements of the crime beyond a reasonable doubt"].) According to Langlois, because the error affected the prosecution's burden to prove each element beyond a reasonable doubt, due process requires the People to demonstrate that the error was harmless beyond a reasonable doubt under the *Chapman* standard. In his reply brief, Langlois attempts to distinguish between a forensic cause of death and the legal cause of death, asserting that they differ.

## C. Trial Court's Duty to Instruct on Causation

As stated *ante*, " ' "in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." ' " (*Breverman, supra*, 19 Cal.4th at p. 154.) However, a trial court has a duty to instruct on causation only when causation is at issue. (*People v. Cervantes* (2001) 26 Cal.4th 860, 866-874 (*Cervantes*); *People v. Bell* (2020) 48 Cal.App.5th 1, 17 (*Bell*); *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590-591 (*Bernhardt*); see also Bench Note to CALCRIM No. 620 (January 2006), italics added, citing *Bernhardt* ["*If causation is at issue*, the court has a **sua sponte** duty to instruct on proximate cause"].)

## D. Analysis

Langlois completely misreads the prosecutor's closing argument. The prosecutor did not argue Langlois caused the victim's death by hitting him with a coffee table or that Langlois's act of doing so contributed to the victim's death. In fact, the prosecutor

argued he did not have to prove Langlois committed an act that caused the victim's death. The prosecutor argued that the act of striking the victim with a coffee table showed Langlois was a direct perpetrator of an assault likely to cause bodily injury and further, under the circumstances, the act of hitting the victim with the coffee table demonstrated Langlois's shared intent to kill the victim.

Further, we agree with the Attorney General that the trial court was not obligated to instruct the jury with CALCRIM No. 620 sua sponte because causation was not in issue. The cause of the victim's death was not disputed. It is irrefutably clear that he died as a result of a stab wound to the chest which penetrated his heart, not by a blow inflicted by a coffee table. Therefore, while a trial court has the sua sponte duty to instruct on the definition and application of proximate cause in a case where causation is at issue (*Cervantes*, *supra*, 26 Cal.4th at pp. 866-874; *Bell, supra,* 48 Cal.App.5th at p. 17; *Bernhardt, supra,* 222 Cal.App.2d at pp. 590-591), this is not such a case.

Langlois relies on *People v. Schmies* (1996) 44 Cal.App.4th 38, 50 (*Schmies*), a case that is completely inapposite. In *Schmies*, the victim died as a result of being struck by a police car which was involved in a high-speed chase pursuing the defendant. (*Id.* at pp. 43-44.) At trial, the defendant argued that the pursuing officer's actions were a superseding intervening act, breaking the chain of causation and relieving him of liability. (*Id*. at p. 45.) The jury found the defendant guilty of vehicular manslaughter with gross negligence. (*Ibid*.) On appeal, the defendant challenged the trial court's exclusion of evidence relating to CHP pursuit polices and the reasonableness of the pursuing officers' actions. (*Id*. at p. 46.) Following a discussion of dependent and independent intervening acts and superseding causes, the *Schmies* court stated: " '[a] defendant may be criminally liable for a result directly caused by his act even if there is another contributing cause. If an intervening cause is a normal and reasonably foreseeable result of defendant's original act the intervening act is "dependent" and not a superseding cause, and will not relieve defendant of liability.' [Citation.] Moreover, as leading commentators have put it, '[i]f

80

the intervening act or other cause is reasonably foreseeable, it will not supersede.' " (*Id.* at p. 50.) Here, Langlois did not argue that the stabbing was an intervening superseding cause of the victim's death; nor did the prosecution argue that defendant's act of hitting the victim with a table directly or even indirectly caused the victim's death.

We agree with the Attorney General that the trial court had no sua sponte duty to instruct on causation as urged by Langlois. Langlois's contention to the contrary is completely meritless.

## VII. Withdrawal from Aiding and Abetting

### A. Langlois's Contentions

Langlois asserts that the trial court erred in failing to include language on the defense of withdrawal and the prosecution's burden as to that defense in the CALCRIM No. 401 instruction. According to Langlois, evidence presented at trial, specifically his statements upon arrival at the victim's house, gave rise to the issue of withdrawal, a factual issue on which the prosecution bore the burden of proof. Langlois contends that the evidence demonstrates he announced his intention to withdraw and urged his associates not to proceed; as such, it was up to jury to determine whether he did everything within his power sufficient to constitute withdrawal. According to Langlois, the trial court was required to instruct on withdrawal sua sponte, because substantial evidence supported that defense.

### B. Trial Court's Obligation to Instruct on Withdrawal

"[I]n a case involving general liability as an aider and abettor for the originally contemplated crime, a defendant will not be liable for the contemplated crime despite the fact that he aided, promoted, encouraged, or instigated the commission of the crime with the intent that it be committed, if he effectively withdraws from participation in the crime before it is committed." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 384 (*Fiu*).) Under a theory of liability premised on aiding and abetting under the natural and probable consequences doctrine, "a defendant will not be liable for crimes other than the

contemplated crime, even though they are the natural and probable consequence of that crime, if he effectively withdrew before the commission of those offenses." (*Ibid*.)

"To be entitled to an instruction on the withdrawal defense, a defendant charged with aiding and abetting a crime must produce substantial evidence showing that (1) he notified the other principals known to him of his intention to withdraw from the commission of the intended crime or crimes, and (2) he did everything in his power to prevent the crime or crimes from being committed." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055 (*Shelmire*).) "[I]n criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*Breverman, supra*, 19 Cal.4th at p. 154.)

## C. Analysis

The trial court omitted from CALCRIM No. 401 the bracketed language relevant to withdrawal.[33] Neither defense attorney requested the withdrawal language be included with CALCRIM No. 401, and the trial court did not include it sua sponte.

The evidence presented to the jury indicated that, after J.D., J.P., Powell, and Langlois arrived in the victim's neighborhood, J.D. seemed to be having some difficulty identifying exactly which house he was looking for. According to J.P., Langlois told J.D., "[I]f you can't figure it out, we should leave. Let's get out of here." (Italics

---

[33] The omitted parenthetical language from CALCRIM No. 401 on the withdrawal defense would have stated: "A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things: [¶] 1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime. [¶] AND [¶] 2. He or she must do everything reasonably within his or her power to prevent the crime from being committed. He or she does not have to actually prevent the crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."

omitted.)  Also according to J.P., Langlois said, "[T]his is stupid.  This is retarded.  Let's just go," or "I got to get these guys out of here.  This is retarded.  What are we doing here?"  (Italics omitted.)  According to J.D., when he expressed discomfort with going forward, Langlois told him:  "[I]t's too late.  Don't act like a bitch.  It's time to go."  (Italics omitted.)  According to J.P., after Langlois made the statements J.P. attributed to him, J.D. saw the house he was looking for, said "fuck it," ran up to the house, and kicked in the door.  (Italics omitted.)

We do not agree with Langlois that his statements, as recounted by J.P., constituted substantial evidence to warrant an instruction on withdrawal.  There was not substantial evidence that Langlois announced his intention to withdraw to all concerned.  At best, the evidence merely demonstrates Langlois expressed frustration at the seeming absurdity of the situation and/or a suggestion that they should abort the plan if J.D. had forgotten which house they were looking for.  But those statements did not indicate Langlois intended to withdraw or that he was discontinuing his participation.

Moreover, this evidence cannot reasonably be characterized as demonstrating that Langlois did everything within his power to prevent the home invasion, assault, or murder from happening.  Merely suggesting he and his confederates should leave was insufficient for a reasonable jury to conclude Langlois did everything within his power to stop the retaliation plan.  There was much more within his power he could have done to stop the others, including making noise to call attention to the others, threatening to contact the police, or actually calling 911 himself on the phone he later used to photograph T.B.'s contact information.

Lastly, the evidence conclusively establishes that Langlois did not, in fact, "effectively withdraw[] from participation in the crime before it [wa]s committed."  (*Fiu, supra*, 165 Cal.App.4th at p. 384.)  "[W]ithdrawl goes to the issue of whether or not the defendant was a participant in the offense at the time it was committed."  (*Ibid*.)  The defense relates "to whether or not the defendant was an active participant at the time the

crime was committed." (*Id.* at p. 384, fn. 29.) Here, the evidence establishes that Langlois willingly entered the victim's house and assisted in the attack, including hitting the victim with a coffee table.

Because we conclude that there was not substantial evidence that Langlois announced his intention to withdraw to J.P., Powell, and J.D., or that Langlois did everything within his power to prevent the home invasion and the attack on the victim from occurring, and he did not, in fact, withdraw, but rather provided active assistance in the crimes, we conclude that the trial court did not abuse its discretion by not including in its CALCRIM No. 401 instruction the bracketed language on withdrawal. (See *Shelmire, supra*, 130 Cal.App.4th at p. 1055 [defendant not entitled to instruction on withdrawal because substantial evidence did not support it where evidence established that the defendant hung back while others went into apartment where the victim was shot and killed, waited until they reemerged, and fled with them].)

We further conclude that any error in failing to instruct the jury with the withdrawal language from CALCRIM No. 401 was harmless under any standard. In light of the evidence as a whole and particularly the lack of evidence relevant to Langlois's alleged withdrawal, we conclude, beyond a reasonable doubt, that any failure to instruct the jury with the withdrawal language from CALCRIM No. 401 did not contribute to the verdict. (*Chapman, supra*, 386 U.S. at p. 24.)

## VIII.  Trial Court's Refusal to Excuse Juror No. 7

### A.  Additional Background

During jury deliberations, Langlois's attorney learned of an issue involving Juror No. 7. Counsel informed the court as follows: "According to, first, a family friend who works at a Mercedes dealership here in Sacramento who is a friend of Mr. Langlois' family, that after work yesterday juror number seven . . . came in to pick up a part and was talking to a technician named Jose. [¶] She started talking about the fact that she was on a jury. They were deliberating. They had hung up on the issue of intent. She

mentioned they were 10 to 2, and, according to Jose, she said -- he said, I can't believe she started talking to me about this. [¶] Apparently, in the last text I just received, she was asking one of them -- perhaps he said, I know who you're talking about, and she asked if they were nice guys, and he said yes." (Italics omitted.)

The trial court then questioned Juror No. 7 outside the presence of the other jurors. Juror No. 7 stated she had been at a Mercedes dealership to buy a sun shade, and someone asked her about her jury badge. She responded that she was on a jury. The person asked what kind of case, and she responded it was a murder case. The person then asked, "[W]as that the one in Citrus Heights," and said that he had read about it in the newspaper, and Juror No. 7 responded that it was. (Italics omitted.) Juror No. 7 told the person that she was not allowed to talk about it. He responded, "I would never say anything." (Italics omitted.) According to Juror No. 7, that was the extent of the discussion.

The trial court asked, why Juror No. 7 felt compelled to confirm that she was a juror in a Citrus Heights murder case, and she responded that she did not know. The trial court reminded Juror No. 7 about the daily admonition that the jurors were not allowed to discuss any aspect of the case, and told her that she could not even tell someone what she told the person at the dealership. The trial court asked Juror No. 7 whether she knew that, and she responded she did not.

In response to the trial court's questions whether she had told anybody else about any aspect of this case, whether she had discussed with anyone what was going on with the jury's deliberations, and whether she discussed with the person at the dealership what was happening in the jury room, Juror No. 7 responded, "No" to each question.

The court then told Juror No. 7, "It was brought to my attention that you had a conversation with a person, an employee, at the Mercedes dealership, regarding the deliberations; that you were – the jury was 10 to 2. They were having ---" At which point Juror No. 7 interjected, "Oh, no." The court finished, "with the issue of intent." The

85

court said, "that's the claim that was being attributed to you." Juror No. 7 responded, "That is not true." The court followed up, "So that the jury is hung ten [to] two. They're discussing the issue of intent. [¶] None of that occurred?" Juror No. 7 responded, "No. Nothing."

After Juror No. 7 left the courtroom, Langlois's attorney asserted that Juror No. 7 was not being completely forthcoming and that the source of the information would not simply make it up. He argued Juror No. 7 "said enough to get her removed from the jury." Powell's attorney agreed. The prosecutor disagreed based on what he believed to be Juror's No. 7's genuine and surprised reaction to the discussion of the issue of intent and the purported 10 to 2 split. The prosecutor stated that disclosing that she was on a case involving a murder in Citrus Heights was "arguably technically misconduct," but further asserted: "I don't think there's a prejudice there, and I don't think there is enough to remove her from the jury at this point."

Powell's attorney asserted that Juror No. 7's reaction could be a result of being caught in misconduct.

The trial court then stated: "It's been my experience with jurors whenever I have inquired of them, they seem to be pretty truthful, and they will admit, oh I messed up, or I should not have said that. I now realize that. She did not seem to me to be withholding information. [¶] I think she did seem surprised, in fact, sort of incredulous that that comment would even be made. [¶] So I can only go on her demeanor and the actual conversation that the Court had with her, and both of you were satisfied with that conversation. [¶] So it does not appear to me at this time that there is misconduct that I should remove her."

Langlois's attorney requested that deliberations be halted and that the court conduct a hearing to take evidence from witnesses at the dealership. He asserted: "I don't think this person made up all these specific things that she's not willing to admit." The prosecutor responded: "If the Court feels like there is some question about the

juror's candidness then that would be the next step." The trial court asked Langlois's attorney how he would reach the person at the dealership, and he responded that he would reach him through Langlois's mother because the people at the dealership "are known to the family. They have known them for years."

The prosecutor then stated that the record should reflect that the information concerning the interaction was coming from Langlois's mother, "who has been texting numerous things throughout this case. She's also taken a photograph of a juror in the hallway. [¶] She's been very knee deep in things going on, and the two people that allegedly have heard this conversation are both close family friends, is my understanding. One of them Miss Langlois refers to as a 'second son' of hers. So there is some potential bias from those folks that the juror would not share." Langlois's attorney responded that he did not know anything about the relationship.

The trial court instructed Langlois's attorney to follow up to obtain information about the individual from the Mercedes dealership and his availability. Following a recess, an individual from the dealership, Jose Armenta, appeared before the trial court for a hearing.

Armenta testified that he was at work at the Mercedes dealership the previous day when a woman approached who said she was interested in purchasing a sun visor. Armenta walked her to the parts department and asked her how her day was going. The woman responded that she was on a jury. Armenta said that he hoped it was interesting, and the woman responded that it was a murder trial. The woman said, "[R]ight now we're trying to prove intent. There's a couple knuckle heads on the jury that don't know what intent is." (Italics omitted.) Armenta said he responded, "[Y]ou either went to do it or you didn't, or, you know, sometimes there's other things that happened." The woman replied that "they kicked the door in at 6:00 in the morning." Armenta then asked, "Jeff and [J.D.]?" According to Armenta, Juror No. 7 responded, "How do you know?" Armenta said he told Juror No. 7 he read it in the paper and, as it turned out, a friend of

87

his knew them, and Armenta knew all the particulars of the case. According to Armenta, the woman asked him if "they were good dudes." Armenta said she talked about how J.D. had been hit in the back of the head with brass knuckles, which started the whole chain of events, something Armenta said he did not know. She also disclosed that the person they were looking for when they entered the house was asleep in a bedroom while his father was asleep on a couch. As the conversation ended, the woman said, "[W]e never talked about this," and Armenta responded, "I know." Before she left, Armenta asked the woman her name and she told him. Armenta testified he then called a friend, who happened to know J.D., Powell, and Langlois, and told him about the conversation, and the friend apparently contacted Langlois's mother.

Armenta testified that he had met J.D. on one occasion, and that he had also met Powell before. He said that he and Powell had attended barbeques at Armenta's friend's house on occasion. Armenta testified he did not know Langlois.

The trial court then brought Juror No. 7 into the courtroom. She stated that she recognized Armenta as the individual with whom she had the conversation at the dealership, and Armenta identified Juror No. 7.

After a recess, the trial court again questioned Juror No. 7, this time under oath. Juror No. 7 testified that the conversation was as she had represented it to the court earlier, and that Armenta's representations about her telling him specifics concerning the case were not true. She testified that Armenta sought specific information about the trial from her. Juror No. 7 testified that she only indicated that it was a murder case, perhaps mentioned it was out of Citrus Heights, and that she could not talk about it. The court remarked that Armenta was saying that she told him a lot about the case, and Juror No. 7 responded: "I know. I feel like I'm being framed." When the court noted that Armenta stated that Juror No. 7 asked if "they were good dudes," (italics omitted) Juror No. 7 responded: "I can't believe this." Later, when the court asked Juror No. 7 if it was her testimony that she did not say anything to Armenta other than what she had represented

88

to the court, she responded: "I'd already made a decision on what he was doing. I mean, he said he knew these guys. I mean, he obviously called somebody right away. [¶] *I totally see what he did*." (Italics added.) The trial court said: "you're looking incredulous like you can't believe this is that accurate." Juror No. 7 responded: "I know. No. It's not true." The court followed up: "I mean, are you incredulous over these -- what he is alleging you said to him?" Juror No. 7 responded, "it's not true. I'm stating that it's not true." The trial court asked Juror No. 7 if, at the end of the conversation, Armenta asked her name and she told him. She responded that she did give him her name, and then she posed the question, "why would I give him my name if I talked about all this?"

The trial court then asked Juror No. 7 if she could be fair to all parties if she remained a juror despite what had happened. She responded: "Certainly." The court followed-up: "So . . . this information, this inquiry that I conducted this morning and now this afternoon, would it in any way affect your ability to continue to deliberate?" Juror No. 7 replied, "Absolutely not." The court then asked: "Would you hold this information that I have asked you about against any party in this case if you were allowed to continue to deliberate?" Juror No. 7 replied, "No." The court then asked: "What is your feeling if you were asked to continue to deliberate? Do you think you could do so fairly and objectively?" Juror No. 7 responded, "I know I could." When asked about the words "dudes" and "knuckleheads," Juror No. 7 stated she does not use words like those.

Thereafter, outside the presence of Juror No. 7, Langlois's attorney asked that she be removed, expressing skepticism that Armenta would fabricate the story and that Juror No. 7 would admit to misconduct. Powell's attorney did not submit further argument.

The prosecutor asserted, based on Juror No. 7's reactions, there was no way the exchange happened in the way Armenta claimed. The prosecutor expressed skepticism that Juror No. 7 would give her name to Armenta after improperly disclosing information, and that she, an older woman, would use terms such as "knuckle heads" and

89

"good dudes." The prosecutor asserted that, during his testimony, Armenta appeared nervous. This observation was not refuted by either defense attorney and the trial court did not say it disagreed. The prosecutor also asserted that the information Armenta raised appeared in recently published newspaper articles. Armenta also had connections to defendants and J.D.

The trial court stated "I believe her. I absolutely believe her." The court stated that its experience was that, when confronted with misconduct, jurors acknowledge it. The court observed that Juror No. 7 had no interest in the case, whereas Armenta did. The trial court did not deem it misconduct that Juror No. 7 acknowledged she was a juror on a murder case. The court stated, by putting her under oath, I wanted to make sure she understood how serious this was. The court stated: "I don't believe she lied to the court." The court stated its biggest concern after going through all of this with the juror was whether she could still be fair. The court then stated: "She at least satisfied me that she would."

Powell's attorney subsequently reiterated his objection to Juror No. 7 continuing in the case. He asserted that she "felt that she had been set up by this individual who had confronted her at [the] dealership" and she also purportedly said, "I know what's going on." (Italics omitted.) Powell's attorney expressed concern that Juror No. 7 could harbor ill will towards "the individuals that she may feel set her up."

### B. Defendants' Contentions

Defendants assert that the trial court improperly denied the defense motion to exclude Juror No. 7 based on her reasonable perception that they may have attempted to fabricate an accusation that she committed misconduct. Defendants concede that Juror No. 7 was falsely accused of misconduct based on her conversation with Armenta. However, defendants assert that, because Juror No. 7 would have been left with the impression that defendants may have orchestrated the accusation against her, she could not have helped but be prejudiced against them. Langlois emphasizes Juror No. 7's

90

reaction to the circumstances at the hearing, expressing that she felt as though she was being "framed," and stating, "I can't believe this . . . ." According to Langlois, Juror No. 7 "made it patently clear that she believed the defendants were attempting to manufacture a reason to remove her from the jury and/or to create an issue to be used on appeal after their conviction." Defendants acknowledge that a defendant is barred from complaining about juror misconduct which was invited by their own misconduct, but further assert that, here, they did not contribute to the situation which gave rise to Juror No. 7's implied bias against them. However, Juror No. 7 nevertheless must have attributed the circumstances to defendants, and was thus biased against them. Defendants emphasize the connections between Armenta and defendants, and assert that Juror No. 7 "must have drawn the conclusion that Armenta was somehow acting at the behest of the defendants, or at least with their knowledge."

### C. Trial Court's Duty to Excuse a Sworn Juror Based on Bias

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it." ' " (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"If at any time… upon … good cause shown to the court a juror is found to be unable to perform his or her duty . . . , the court may order the juror to be discharged and draw the name of an alternate, who shall then take a place in the jury box." (§ 1089.) A juror may be excused for bias. (Code Civ. Proc. § 225, subd. (b)(1)(C) ["Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party"]; Code Civ. Proc. § 229, subd. (f) [implied bias—"[t]he existence of a state of mind in the juror evincing enmity against, or bias towards, either party"].)

"A trial court 'has broad discretion to investigate and remove a juror in the midst of trial where it finds that, for any reason, the juror is no longer able or qualified to serve.' " (*People v. Bennett* (2009) 45 Cal.4th 577, 621 (*Bennett*).) "Although [an appellate court] reviews for abuse of discretion a court's ruling discharging a juror pursuant to section 1089 [citation], . . . such review involves a 'heightened standard [that] more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.' [Citations.] Specifically, the juror's 'inability to perform' his or her duty 'must appear in the record as a demonstrable reality.' [Citations.] [¶] Under the demonstrable reality standard, a reviewing court's task is more 'than simply determining whether any substantial evidence in the record supports the trial court's decision.' [Citation.] 'A substantial evidence inquiry examines the record in the light most favorable to the judgment and upholds it if the record contains reasonable, credible evidence of solid value upon which a reasonable trier of fact *could* have relied in reaching the conclusion in question. Once such evidence is found, the substantial evidence test is satisfied . . . . [¶] The demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that [good cause for removing the juror is] established. It is important to make clear that a reviewing court does not *reweigh* the evidence under either test. Under the demonstrable reality standard, however, the reviewing court must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied. [¶] In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides.' " (*People v. Armstrong* (2016) 1 Cal.5th 432, 450-451 (*Armstrong*).)

### D. Analysis

To properly address the issue presented, we first clarify what defendants *do not* contend. Defendants do not assert that Juror No. 7 committed misconduct. Defendants

do not assert that the trial court erred or abused its discretion in declining to discharge Juror No. 7 and substitute an alternate juror based on misconduct committed by Juror No. 7. What they *do* assert is that, based on what Juror No. 7 must have interpreted as defendants' attempts to "frame" her, she could not be unbiased and impartial, and therefore the trial court should have granted their request that it discharge Juror No. 7.

After Juror No. 7 said she felt like she was being framed, the trial court asked her if she could be fair to all parties if she remained a juror despite what had happened. She responded: "Certainly," and testified that these developments would not affect her ability to deliberate. She further testified that she would not hold the situation against any party. She proclaimed that she knew she could deliberate fairly.

In ruling, the trial court stated that "I absolutely believe her." The court had earlier made references to Juror No. 7's demeanor which it described as a look of surprise and of being incredulous at the accusations. None of the attorneys disputed the demeanor she displayed, although one disagreed with the cause. During the second round of questions, which were this time answered under oath, the court asked the juror about her demeanor displaying that she was incredulous, and Juror No. 7 replied that the accusations were not true. The court noted that Juror No. 7 had no interest in the case, whereas Armenta did. The court stated that it was satisfied that Juror No. 7 could deliberate fairly and ruled that it would retain Juror No. 7.

Based on its examination of Juror No. 7, the trial court plainly concluded that she did not present a threat of bias. The trial court was in a position to observe Juror No. 7's demeanor and evaluate her responses accordingly (*Bennett, supra*, 45 Cal.4th at p. 621; *People v. Schmeck* (2005) 37 Cal.4th 240, 298 (*Schmeck*), overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638), and the court was clearly persuaded that she could continue to perform her duties impartially. (*Bennett*, at p. 621.) "[W]e afford deference to the trial court's credibility determinations, 'based, as they are, on firsthand observations unavailable to us on appeal.' " (*Armstrong, supra*, 1 Cal.5th at

93

p. 451.)  Based on our review, the record supports the conclusion that the trial court relied on specific evidence supporting its ruling and that evidence did support its ruling.  (*Id*. at pp. 450-451; *Bennett*, at p. 621.)

Defendants essentially speculate that Juror No. 7 must have been biased against them.  However, there is nothing in the record to substantiate this speculation.  (*Bennett, supra*, 45 Cal.4th at p. 621.)  Indeed, after saying she felt like she had been framed by what Armenta had reported to the court, Juror No. 7 stated:  "I totally see what *he* did." (Italics added.)  Contrary to what trial counsel for Powell asserted, she did not at any point say that "I know what's going on."  (Italics omitted.)  In context, the "he" to which she referred when she said "I totally see what *he* did," was Armenta.  She never expressed the concern or belief that defendants tried to frame her or that Armenta tried to do so at the behests of defendants.

We conclude that the trial court did not abuse its discretion in declining to excuse Juror No. 7.  (See *Schmeck, supra*, 37 Cal.4th at pp. 295-298 [trial court did not abuse its discretion in declining to discharge juror based on alleged bias arising from conduct of public defender's investigator].)

## IX.  Cumulative Error

Langlois asserts, and Powell joins in contending, that, even if no single error mandates reversal, the cumulative effect of the errors resulted in a miscarriage of justice, thus warranting reversal.  Defendants assert that the cumulative effect of the errors violated their due process right to a fair trial.

The premise behind the cumulative error doctrine is that, while a number of errors may be harmless taken individually, their cumulative effect requires reversal.  (*People v. Bunyard* (1988) 45 Cal.3d 1189, 1236-1237.)  Any of the potential errors identified above "were harmless, whether considered individually or collectively.  Defendant was entitled to a fair trial but not a perfect one."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  We have found no prejudice when considering defendants' claims separately.

Viewed cumulatively, our conclusion is the same.  Defendants were not deprived of a fair trial.

## DISPOSITION

The judgments are affirmed.

/s/
MURRAY, J.

We concur:

/s/
RAYE, P. J.

/s/
DUARTE, J.